UNITED STATES of America,
Petitioner–Appellee,

v.

CONSTRUCTION PRODUCTS RESEARCH, INC.; Five Star Products, Inc.; and H. Nash Babcock, Respondents–Appellants.

No. 342, Docket 95–6067.

United States Court of Appeals,
Second Circuit.

Argued Oct. 30, 1995.

Decided Jan. 2, 1996.

Michael F. McBride, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Washington, D.C. (Deirdre G. Johnson, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Washington, D.C.; Harold James Pickerstein, Trager and Trager, Fairfield, CT; Eugene R. Fidell, Mark M. Brandsdorfer, Feldesman, Tucker, Leifer, Fidell & Bank, Washington, D.C., of counsel), for Respondents–Appellants.

Katherine S. Gruenheck, Attorney, Appellate Staff Civil Division, Department of Justice, Washington, DC (Frank W. Hunger, Assistant Attorney General, Christopher F. Droney, United States Attorney, Barbara C. Biddle, Attorney, Appellate Staff Civil Division, Department of Justice, Charles E. Mullins, Senior Attorney, Office of the General Counsel, Washington, DC, of counsel), for Petitioner–Appellee.

Before: NEWMAN, Chief Judge, ALTIMARI, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

·The Nuclear Regulatory Commission ("NRC") issued a subpoena, requiring Construction Products Research, Inc. ("CPR"), Five Star Products, Inc. ("Five Star"), and their Custodian of Records, H. Nash Babcock (together, "Respondents") to produce employment records of certain employees and other employment-related documents. Respondents moved before the NRC to quash the subpoena, but their motion was denied. Asserting that the NRC lacked authority to enforce the subpoena and that certain documents were privileged, Respondents refused to comply.

The United States, on behalf of the NRC, petitioned to enforce the subpoena in the United States District Court for the District of Connecticut (Alan H. Nevas, *Judge*). The district court referred the petition to a magistrate judge (Holly B. Fitzsimmons, *Magistrate Judge*), who recommended that the petition be granted and that Respondents' claim of privilege be rejected. The district court adopted the magistrate judge's recommendation, issued an order of enforcement, and denied a motion for reconsideration of the privilege issue. Respondents appealed, and moved to stay the enforcement order in the district court, this Court, and in the Supreme Court. All three courts denied the motion. Respondents thereafter turned over to the NRC only those documents which they agreed were not privileged, refusing to surrender the allegedly privileged documents.

Respondents now appeal. We affirm.

## BACKGROUND

The NRC is an administrative agency whose job is to regulate atomic energy and safety pursuant to the Atomic Energy Act of 1954 ("AEA"), 42 U.S.C. § 2011 *et seq.*, as amended by the Energy Reorganization Act of 1974 ("ERA"), 42 U.S.C. § 5801 *et seq. See County of Rockland v. United States Nuclear Regulatory Comm'n,* 709 F.2d 766, 769 (2d Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 485, 78 L.Ed.2d 681 (1983). The NRC has authority over public health and safety issues relating to the nuclear power industry in general, and over safety aspects involved in constructing and operating nuclear power plants, in particular. *See* 42 U.S.C. §§ 2012, 2201; 10 C.F.R. § 1.11.

Five Star manufactures grout and structural concrete products used to construct and

repair nuclear power plants. CPR holds the patents for products developed and sold by Five Star. During the period at issue, it also provided testing services to Five Star, thereby ensuring that the grout complied with NRC safety standards. CPR's testing enabled Five Star to certify to NRC licensees that its products met NRC safety regulations. Both CPR and Five Star operate out of the same facility in Fairfield, Connecticut.

In 1992, a CPR employee, Edward Holub, contacted the NRC to express his concern that improper procedures were being used to test Five Star products. The NRC investigated CPR's facility, but was denied access to the testing laboratory. The NRC obtained and executed a search warrant, seizing numerous documents related to CPR's testing of Five Star's products.

Before the NRC completed that investigation, CPR fired Holub. Contending that CPR terminated him in retaliation for tipping off the NRC, Holub filed a claim with the Department of Labor ("DOL"), seeking reinstatement and damages under the Whistleblower Protection Provision of the ERA, 42 U.S.C. § 5851. After investigating Holub's claim, the DOL found that he had engaged in protected activity and was, indeed, unlawfully terminated. An appeal of that finding is still pending.

The NRC thereafter instituted a second investigation. This time, it wished to determine whether Respondents' past treatment of whistleblowers posed a threat to public health and safety. It was specifically interested in whether, by discouraging would-be whistleblowers from coming forward, it increased the likelihood that safety defects escaped detection. As part of this second investigation, the NRC issued the subpoena involved here, requiring Respondents to produce: (1) all documents related to Holub's termination; (2) Holub's personnel file; (3) all of Respondents' policies, procedures, and requirements regarding involuntary terminations; and (4) "position descriptions of jobs" held by Holub and two other employees. Respondents moved before the NRC to quash the subpoena, but the NRC denied the motion. Asserting that the subpoena arose

out of an unauthorized investigation, Respondents refused to comply with it.

The United States, on behalf of the NRC, filed a petition to enforce the subpoena in the United States District Court for the District of Connecticut. The district court referred the petition to a magistrate judge, who recommended that the petition be granted and that Respondents' claim of privilege be rejected as a general defense to enforcement of the subpoena. The district court adopted the magistrate judge's recommended ruling *in toto*, and issued an order of enforcement. This ruling appears not to have considered the applicability of the privilege to any particular document, though it is arguable that the district court's denial of Respondents' motion to reconsider constituted a rejection of the privilege as to all documents for which privilege had been claimed. Respondents appealed, but turned over to the NRC those documents which they conceded were not privileged, while refusing to produce allegedly privileged documents.

On appeal, Respondents argue that (1) the NRC did not have the authority to issue this subpoena; and (2) even if it did, the district court erred by failing to recognize that some of the documents sought by the subpoena were privileged.

## DISCUSSION

### I. *Jurisdiction*

■ There is a threshold problem. The parties assume we have jurisdiction under 28 U.S.C. § 1291, to hear a direct appeal from an administrative subpoena enforcement order, prior to finding someone in contempt of that order. Although our conclusion is by no means obvious, we hold, as have other courts, that we do have jurisdiction.

■ Section 1291 permits review only of "final" district court orders. *See* 28 U.S.C. § 1291. The general rule is that orders enforcing subpoenas issued in connection with civil and criminal actions, or grand jury proceedings, are *not* final, and therefore *not* appealable. *United States v. Ryan,* 402 U.S. 530, 532–33, 91 S.Ct. 1580, 1581–82, 29 L.Ed.2d 85 (1971); *Cobbledick v. United States,* 309 U.S. 323, 328, 60 S.Ct. 540, 542–

43, 84 L.Ed. 783 (1940); *Reich v. National Eng'g & Contracting Co.*, 13 F.3d 93, 95 (4th Cir.1993); *Kemp v. Gay*, 947 F.2d 1493, 1495 (D.C.Cir.1991). To obtain appellate review, the subpoenaed party must defy the district court's enforcement order, be held in contempt, and then appeal the contempt order, which is regarded as final under § 1291. *Ryan*, 402 U.S. at 532, 91 S.Ct. at 1581; *Cobbledick*, 309 U.S. at 328, 60 S.Ct. at 543; *National Eng'g*, 13 F.3d at 95; *Kemp*, 947 F.2d at 1495. "The purpose of this rule is to discourage parties from pursuing appeals from orders enforcing these subpoenas, which would temporarily halt the district court's litigation process or the grand jury process." *National Eng'g*, 13 F.3d at 95.

 There is a different rule, however, in administrative proceedings. A district court order enforcing a subpoena issued by a government agency in connection with an administrative investigation may be appealed immediately without first performing the ritual of obtaining a contempt order. *Id.*; *Kemp*, 947 F.2d at 1495; *see, e.g., Church of Scientology v. United States*, 506 U.S. 9, 11–12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992); *Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 513–14, 11 L.Ed.2d 459 (1964); *Ellis v. ICC*, 237 U.S. 434, 35 S.Ct. 645, 59 L.Ed. 1036 (1915). The rationale is that, at least from the district court's perspective, the court's enforcement of an agency subpoena arises out of a proceeding that "may be deemed self-contained, so far as the judiciary is concerned.... [T]here is not, as in the case of a grand jury or trial, any further judicial inquiry which would be halted were the offending [subpoenaed party] permitted to appeal." *Cobbledick*, 309 U.S. at 330, 60 S.Ct. at 543; *see National Eng'g*, 13 F.3d at 95–96; *Kemp*, 947 F.2d at 1496; *In re Letters Rogatory Issued by Director of Insp. of Gov't of India*, 385 F.2d 1017, 1018 (2d Cir.1967). Thus, although the NRC did not obtain the customary contempt order before it filed this appeal, we nonetheless have jurisdiction, pursuant to § 1291, to review the district court's order enforcing the subpoena at issue here.

 We further note that although Respondents have largely complied with the subpoena, they have not surrendered the allegedly privileged documents. Thus, this case is not moot, at least as to those documents. Even as to the surrendered documents, the case is not moot because Respondents still contest the authority of the NRC to have issued the subpoena in the first place. "[S]o long as the appellant retains some interest in the case, so that a decision in its favor will inure to its benefit, its appeal is not moot." *New England Health Care Employees Union v. Mount Sinai Hosp.*, 65 F.3d 1024, 1029 (2d Cir.1995). Here, Respondents have a privacy interest in all the documents, and will be entitled to their return if the enforcement order should be vacated. *Church of Scientology*, 506 U.S. at 11–14, 113 S.Ct. at 449–50 (holding that production of all records sought by unlawful summons does not moot claim, because summoned party has privacy interest in getting them back); *Reich v. Montana Sulpher & Chemical Co.*, 32 F.3d 440, 443–44 n. 4 (9th Cir.1994) (same).

## II. *Agency Subpoena Power*

Respondents' central theme is that the NRC lacks the authority to issue a subpoena to conduct an investigation into retaliatory employment practices; rather, they urge that such authority is vested solely in the DOL. They further argue that, even if the issuance of such a subpoena is within the NRC's statutory grant of authority, the NRC's investigatory power does not extend to Respondents because they are mere suppliers. In light of the historically expansive interpretation of an agency's power to investigate, we conclude that this subpoena lay well within the NRC's authority because it is the primary body responsible for nuclear safety.

### A. *Historical Background*

Until the 1940s, the Supreme Court narrowly interpreted the scope of an agency's investigative authority. An administrative subpoena was valid only if the agency sought evidence of a specific breach of law. *See, e.g., Jones v. SEC*, 298 U.S. 1, 27, 56 S.Ct. 654, 662, 80 L.Ed. 1015 (1936) ("A general, roving ... investigation, conducted by a commission without any allegations ... is unknown to our constitution and laws; and such

an inquisition would be destructive of the rights of the citizen, and an intolerable tyranny.") (internal quotations and citations omitted); *FTC v. American Tobacco Co.*, 264 U.S. 298, 305–06, 44 S.Ct. 336, 337–38, 68 L.Ed. 696 (1924) ("Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire, and to direct fishing expeditions into private papers on the possibility that they may disclose some evidence of crime.") (internal citation omitted). Accordingly, courts would routinely disallow a general investigation conducted solely to determine policy, make rules, recommend legislation, or ascertain whether administrative or other action was even appropriate. *See generally* Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 4.1 (3d ed. 1994).

Beginning with *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943), however, the Supreme Court underwent a change and significantly loosened the shackles on an agency's power to conduct administrative investigations. In *Endicott Johnson*, the Secretary of Labor was investigating whether Endicott Johnson had violated the Walsh–Healey Public Contracts Act, which barred government contracts to those who violate minimum-wage laws. *Endicott Johnson*, 317 U.S. at 506, 63 S.Ct. at 342. The Secretary issued a subpoena for certain payroll records; Endicott Johnson refused to comply, asserting that the records were not "relevant to the determination of any matter confided to the Secretary's determination." *Id.* at 507, 63 S.Ct. at 342. The Secretary sought enforcement of the subpoena. The district court denied the motion, and set the case down for trial on the question whether the Walsh–Healey Act applied to Endicott Johnson and its employees. *Id.* The Supreme Court held that the district court erred by doing so; rather, it held that in the first instance, an agency could decide whether persons/entities were covered by the relevant statute and could exercise its subpoena power to investigate whether a cause of action existed:

Nor was the District Court authorized to decide the question of coverage itself. The evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the Secretary in the discharge of her duties.... The consequence of the action of the District Court was to disable the Secretary from rendering a complete decision on the alleged violation....

*Id.* at 509, 63 S.Ct. at 343.

■ *Endicott Johnson* was a watershed in administrative investigations. It was now established that an agency could conduct an investigation even though it had no probable cause to believe that any particular statute was being violated. *See United States v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964) (agency "need not meet any standard of probable cause to obtain enforcement of [its] summons"); *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 201, 66 S.Ct. 494, 501, 90 L.Ed. 614 (1946) (agency may conduct an administrative investigation "to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the [agency's] judgment, the facts thus discovered should justify doing so"). Indeed, an administrative agency, like a grand jury, could now "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43, 70 S.Ct. 357, 364, 94 L.Ed. 401 (1950); *see also SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1053 (2d Cir. 1973), *cert. denied*, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974) (agency "must be free without undue interference or delay to conduct an investigation which will adequately develop a factual basis for a determination as to whether particular activities come within the [agency's] regulatory authority"); *United States v. Oncology Servs. Corp.*, 60 F.3d 1015, 1018–19 (3d Cir.1995). Moreover, at the subpoena enforcement stage, courts need not determine whether the subpoenaed party is within the agency's jurisdiction or covered by the statute it administers; rather the coverage determination should wait until an enforcement action is brought against the subpoenaed party. *See Endicott Johnson,*

317 U.S. at 509, 63 S.Ct. at 343; *Brigadoon,* 480 F.2d at 1052–53. *But see Reich v. Great Lakes Indian Fish and Wildlife Comm'n,* 4 F.3d 490, 492 (7th Cir.1993) (statutory coverage could be decided at subpoena enforcement stage, if target of investigation admitted wrongdoing and coverage issue could be determined without examining subpoenaed documents).

■■■■ This is not to say that an agency may conduct any investigation it may conjure up; the disclosure sought must always be reasonable. *Oklahoma Press,* 327 U.S. at 209, 66 S.Ct. at 505–06; *SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1023 (D.C.Cir. 1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979). This limitation of reasonableness is satisfied "[s]o long as an agency establishes that an investigation 'will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within [its] possession, and that the administrative steps required ... have been followed.'" *SEC v. Wall St. Transcript Corp.,* 422 F.2d 1371, 1375 (2d Cir.), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970) (quoting *Powell,* 379 U.S. at 57–58, 85 S.Ct. at 254–55; *see also Morton Salt,* 338 U.S. at 652, 70 S.Ct. at 368–69; *Brigadoon,* 480 F.2d at 1053.

### B. *The NRC Subpoena*

■■■ Respondents deny that the NRC acted within its statutory authority when it inquired into Holub's termination and its possible nuclear safety implications; and even if it did, Respondents challenge whether that authority may be exercised against mere suppliers.

The AEA, 42 U.S.C. § 2011 *et seq.,* as amended by the ERA, 42 U.S.C. § 5801 *et seq.,* establishes a comprehensive regulatory framework for the ongoing review of nuclear power plants in the United States. *See County of Rockland,* 709 F.2d at 768–69. Under the AEA and the ERA, the NRC is charged with primary responsibility to ensure that the generation and transmission of nuclear power do not unreasonably threaten public safety and welfare. *Id.;* 42 U.S.C.

§ 2012. Consistent with its administrative mandate, the NRC is authorized to:

> make such studies and investigations, obtain such information, and hold such meetings or hearings *as the [NRC] may deem necessary or proper to assist it* in exercising any authority provided in this chapter, ... or any regulations or orders issued thereunder. For such purposes the [NRC] is authorized ... by subpena to require *any person* to ... appear and produce documents....

42 U.S.C. § 2201(c) (emphasis added); *see also Oncology Servs.,* 60 F.3d at 1019.

■■■ Although an agency investigation must be conducted for a legitimate purpose, *see Brigadoon,* 480 F.2d at 1054; *In re Sealed Case,* 42 F.3d 1412, 1418 (D.C.Cir. 1994), § 2201(c) does not require that the precise nature and extent of an NRC *investigation* be articulated in a specific provision of the AEA or the ERA. Rather, § 2201(c) makes clear that an NRC investigation is proper if it "*assist[s]* [the NRC] in exercising any authority provided in this chapter, ... or any regulations or orders issued thereunder." 42 U.S.C. § 2201(c) (emphasis added); *see also FTC v. Rockefeller,* 441 F.Supp. 234, 240 (S.D.N.Y.1977), *aff'd,* 591 F.2d 182 (2d Cir. 1979). And, pursuant to NRC regulations, the NRC may exercise its authority through standards-setting and rulemaking; technical reviews and studies; public hearings; issuance of authorizations, permits, and licenses; inspection, investigation, and enforcement; evaluation of operating experience; and confirmatory research. 10 C.F.R. § 1.11(b).

The NRC asserts that the purpose of its subpoena is to determine whether Respondents' treatment of whistleblowers poses a threat to public health and safety by discouraging would-be whistleblowers from coming forward, thereby increasing the likelihood that safety defects will escape detection. That a widespread employment practice of squelching employee disclosure of nuclear risks might have serious safety implications takes no stretch of the imagination:

> Common sense tells us that a retaliatory discharge of an employee for 'whistleblowing' is likely to discourage others from coming forward with information about ap-

parent safety discrepancies. Yet, [the NRC's] safety inspectors cannot be everywhere; to an extent they must depend on help of this kind to do their jobs. Incidents that deter such aid are inherently suspect. They obviously merit full exploration in the interests of safety and certainly are prima facie within [the NRC's] legislative charter.

*Union Elec. Co. (Callaway Plant, Units 1 & 2)*, 9 N.R.C. 126, 134 (1979). Unless the NRC is permitted to investigate whether an employer regularly stifles disclosure of possible nuclear hazards, this practice could go unchecked—a situation rife with safety ramifications.

Here the information sought by the subpoena could reveal an employment practice of discouraging whistleblowing. On the other hand, it might merely assure the NRC that such practices are not taking place. *See Morton Salt Co.*, 338 U.S. at 642–43, 70 S.Ct. at 363–64. Under its mandate to ensure safety from nuclear risks, the NRC might ultimately use the information to exercise its rule-making authority, to issue notices of non-conformance, or to provide reports to Congress. *See* 10 C.F.R. §§ 1.11(b), 2.201; 42 U.S.C. § 2210(p). In any event, the information sought by the subpoena is "not plainly incompetent or irrelevant to any lawful purpose" of the NRC "in the discharge of [its] duties." *Endicott Johnson*, 317 U.S. at 509, 63 S.Ct. at 343. We therefore find that the issuance of the subpoena was within the NRC's statutory authority.

Respondents argue, however, that pursuant to the Whistleblower Protection Provision of the ERA, *see* 42 U.S.C. § 5851, Congress delegated to the DOL—not the NRC— the task of investigating all potential nuclear safety risks resulting from adverse employment practices. We disagree. The Whistleblower Protection Provision provides, in relevant part:

No employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee ... caused to be commenced ... a proceeding under ... the [ERA] or the [AEA].

42 U.S.C. § 5851(a)(1)(D). An employee who claims retaliation under this section must file a complaint with the DOL, which may then investigate the allegations and make a determination. *See* 42 U.S.C. § 5851(b). Congress logically gave the power to resolve § 5851 retaliation claims to the DOL, as those claims are within the DOL's particular area of expertise. *See English v. General Elec. Co.*, 496 U.S. 72, 83 n. 6, 110 S.Ct. 2270, 2277 n. 6, 110 L.Ed.2d 65 (1990) ("[T]he *enforcement and implementation* of [§ 5851] was entrusted by Congress not to the NRC—the body primarily responsible for nuclear safety regulation—but to the Department of Labor.") (emphasis added); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637 (2d Cir.1989).

It bears emphasis, however, that the NRC is not trying to adjudicate Holub's individual retaliation claim; Holub himself has already filed a claim with the DOL and has received a favorable decision. Instead, the NRC is attempting to investigate Respondents' *general* employment practices to determine whether those practices are having a chilling effect on would-be whistleblowers. That aim is quite distinct from the aim of the DOL investigation:

"[T]he [NRC's] investigatory powers and those of the [DOL] under [§ 5851] neither serve the same purpose nor are invoked in the same manner. They are, rather, complementary, not duplicative.... Under [§ 5851] the [DOL] apparently lacks two remedial powers—which the [NRC] possesses— ... the right to take important action against the employer, and the ... authority to do so immediately.... [T]he [DOL] may order only reinstatement and back pay—not correction of the dangerous practices themselves."

*Union Electric*, 9 N.R.C. at 138; *cf.* 42 U.S.C. § 5851(j)(2) (a DOL finding that a retaliation claim has no merit "shall not be considered by the [NRC] in its determination of whether a substantial safety hazard exists").

We further reject Respondents' argument that they are not subject to the NRC's investigatory power. Section 2201(c) authorizes the NRC to subpoena "any per-

son." The term "person" encompasses "any individual, corporation, partnership, firm, association, trust, estate, public or private institution, group, Government agency other than the [NRC].... " 42 U.S.C. § 2014(s). Respondents clearly fall within this broad definition. If and when the NRC decides to use the information obtained by the subpoena, Respondents may then challenge whether they fall within the NRC's enforcement jurisdiction. *See Oklahoma Press,* 327 U.S. at 201, 66 S.Ct. at 501–02 (holding that although agency must defend purpose behind investigation, it is not required to prove cause of action at subpoena enforcement stage); *Endicott Johnson,* 317 U.S. at 509, 63 S.Ct. at 343; *Brigadoon,* 480 F.2d at 1053; *Newmark & Co. v. Wirtz,* 330 F.2d 576, 578 (2d Cir. 1964). We conclude, therefore, that the NRC has the authority to conduct this particular investigation and to obtain the information sought by the subpoena.

### III. *Privilege*

■ Respondents also argue that the district court erred in holding that they had failed to establish their claims of privilege. Whether we consider the district court to have rejected the claim of privilege narrowly as a defense to enforcement of the subpoena or more broadly as a defense to the production of particular documents claimed to be privileged, we disagree with Respondents' claims.

■ Privileged documents are exempt from disclosure. *Morton Salt,* 338 U.S. at 653, 70 S.Ct. at 369. The party asserting the privilege must establish the essential elements of the privilege. *United States v. Adlman,* 68 F.3d 1495, 1499 (2d Cir.1995); *von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 144 (2d Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice. *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976); *Adl-*

*man,* 68 F.3d at 1499; *United States v. Abrahams,* 905 F.2d 1276, 1283 (9th Cir.1990).

■ Respondents also assert a work-product privilege. To invoke this privilege, a party generally must show that the documents were prepared principally or exclusively to assist in anticipated or ongoing litigation. *See* Fed.R.Civ.P. 26(b)(3); *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 471 (S.D.N.Y.1993).

■ To facilitate its determination of privilege, a court may require "an adequately detailed privilege log in conjunction with evidentiary submissions to fill in any factual gaps." *Bowne,* 150 F.R.D. at 474; *see also In re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th Cir.1992). The privilege log should:

> identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship .between ... individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony. Even under this approach,. however, if the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege, his claim will be rejected.

*Bowne,* 150 F.R.D. at 474 (citations omitted); *see also von Bulow,* 811 F.2d at 146; *In re Grand Jury Subpoena Dtd. Jan. 4, 1984,* 750 F.2d 223, 224–25 (2d Cir.1984).

We have reviewed Respondents' privilege log, and find it deficient. The log contains a cursory description of each document, the date, author, recipient, and "comments." Further, under a heading entitled "Basis of Claim," each of the documents listed is alleged to be an "Attorney–Client Communication."

These general allegations of privilege, however, are not supported by the information provided. For example, descriptions and comments for some of the documents listed are as follows: (a) "Fax Re: DOL Findings" with comment "cover sheet;" (b) "Fax: Whis-

tleblower article" with comment "Self-explanatory;" (c) "Letter Re: Customer Orders" with comment "Re: Five Star Products;" (d) "Summary of Enclosures" with comment "Self-explanatory;" etc. The descriptions and comments simply do not provide enough information to support the privilege claim, particularly in the glaring absence of any supporting affidavits or other documentation. *See Bowne,* 150 F.R.D. at 475; *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.,* 145 F.R.D. 84, 88 (N.D.Ill.1992) (privilege log should provide "a specific explanation of why the document is privileged").

We have fully considered all other claims advanced on this appeal and find them to be without merit.

## CONCLUSION

The NRC had the authority to issue the subpoena, and Respondents have failed to demonstrate their claims of privilege. Thus, the judgment of the district court is AFFIRMED.