### In re INITIAL PUBLIC OFFERING SECURITIES LITIGATION.

#### No. 21 MC 92(SAS).

United States District Court,
S.D. New York.

Oct. 30, 2003.

Melvyn I. Weiss, Robert Wallner, Ariana J. Tadler, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Stanley Bernstein, Robert Berg, Rebecca Katz, Bernstein Liebhard & Lifshitz, LLP, New York City, for Plaintiffs.

Gandolfo V. DiBlasi, Sullivan & Cromwell, New York City, for Defendants (Underwriters).

Jack C. Auspitz, Morrison & Foerster LLP, New York City, for Defendants (Issuers).

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiffs in these consolidated actions allege securities fraud in connection with 309 technology stocks that went public in the late 1990s. Defendants consist of the fifty-five investment banks that underwrote the offerings ("Underwriter Defendants") and the 309 companies that went public, along with certain of their officers and directors.

The essence of plaintiffs' claims is that the Underwriters created artificial aftermarket demand for these stocks "by conditioning share allocations in initial public offerings upon the requirement that customers agree to purchase, in the aftermarket, additional shares...."[1] The Underwriters, in turn, profited from these so-called Tie-in Agreements by "demand[ing] that the customers share a material portion of the profits ob-

---

**1.** Master Allegations ("MA") ¶ 14.

tained from the sale of those allocated IPO shares through one or more of the following types of transactions: (a) paying inflated brokerage commissions; (b) entering into transactions in otherwise unrelated securities for the primary purpose of generating commissions; and/or (c) purchasing equity offerings underwritten by the Underwriter Defendants, including, but not limited to, secondary (or add-on) offerings that would not be purchased but for the Underwriter Defendants' unlawful scheme."[2] Collectively, plaintiffs refer to these payments as "Undisclosed Compensation."[3]

In framing their claims, plaintiffs' counsel relied on information provided by certain investors, not identified in the pleadings, who were allegedly required to enter into Tie-in Agreements and to pay Undisclosed Compensation.[4] This opinion addresses the following question: Are plaintiffs now required to identify, in response to Underwriters' discovery demands, investors (of whom plaintiffs are aware) who allegedly were engaged in Tie-in Agreements or paid Undisclosed Compensation?

## I. BACKGROUND

On February 28, 2003, Underwriters served their first set of interrogatories and document requests, which included the following:

> 1. For *each instance* in which any person was "required or induced" to purchase securities in the aftermarket of an IPO in order to obtain an IPO allocation (*see, e.g.,*

Master Allegations Paragraph 34), please provide the following information:

> a. the identity, last known address and telephone number of each person so required or induced;
>
> \* \* \* \* \* \*
>
> 2. For *each instance* in which any person was required or induced to generate commissions or to engage in transactions in other securities in order to obtain an IPO allocation (*see, e.g.,* Paragraphs 17 and 30 and Exhibit B of the Master Allegations), please provide:
>
> a. the identity, last known address and telephone number of each person so required or induced;[5]

Plaintiffs initially objected to these requests, and a motion to compel was briefed and fully submitted in May of 2003. Subsequently, the parties entered into a letter agreement purporting to resolve this dispute. That letter agreement, dated July 10, 2003, and signed by liaison counsel for plaintiffs and Underwriters, provided:

> Plaintiffs will produce, by a reasonable date to be agreed, the identifying information sought by Interrogatories 1(a) and 2(a) propounded by the Underwriter Defendants on February 28, 2003. . . . The information will be presented in a form that reflects whether it responds to Interrogatory 1(a), 2(a), or both.[6]

On July 31, 2003, plaintiffs wrote to the Underwriters implicitly declining to make the agreed-upon disclosures.[7] Rather, plain-

---

2. *Id.* ¶ 17.

3. *See id.*

4. *See id.* ¶ 34. Plaintiffs were not required to reveal the identities of their sources in the pleadings. *See In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 358–59 (S.D.N.Y.2003) ("Where, as here, there are many confidential sources who all say the same thing—that they were required to enter into Tie-in Agreements—and those sources are corroborated by a vast number of media reports (including admissions by insiders), as well as intensive investigations by both state and federal agencies, the cumulative effect of the evidence is important. In such a case, the sheer volume of the corroboration obviates the need for absolute particularity."); *see also Novak v. Kasaks*, 216 F.3d 300, 314 (2d

Cir.2000) (where allegations are based solely on information from confidential sources, "there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

5. The Underwriter Defendants' First Set of Interrogatories and Request for the Production of Documents (emphasis added), Ex. A to 10/10/03 Letter from Gandolfo V. DiBlasi, Underwriters' liaison counsel, to the Court ("10/10/03 Ltr.").

6. Letter Agreement, Ex. E to 10/10/03 Ltr.

7. *See* 7/31/03 Letter from Robert A. Wallner, plaintiffs' liaison counsel, to Gandolfo V. DiBlasi, Ex. E to 10/10/03 Ltr.

tiffs identified twenty-three "individuals who provided *source material* incorporated into Exhibit B and/or Paragraph 34 of the Master Allegations." [8]

Underwriters now seek to compel a complete response to interrogatories 1(a) and 2(a). In particular, they expect plaintiffs to identify *all* individuals, known to plaintiffs, who were required to enter into Tie–In Agreements or to provide Undisclosed Compensation, whether or not they provided "source material" for plaintiffs' pleadings. Plaintiffs argue that this information is protected under the attorney work product doctrine or, alternatively, by a public policy protecting whistle-blowers, and accordingly move this Court for a protective order.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 26(c), titled "Protective Orders," provides in pertinent part:

Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ...

(1) that the disclosure or discovery not be had;

\* \* \* \* \* \*

8. *Id.* (emphasis added).

9. Fed.R.Civ.P. 26(c).

10. *See Penthouse Int'l, Ltd. v. Playboy Enters., Inc.,* 663 F.2d 371, 391 (2d Cir.1981) ("the burden is upon the party seeking non-disclosure or a protective order to show good cause"). *See also In re "Agent Orange" Prod. Liab. Litig.,* 104 F.R.D. 559, 571 (E.D.N.Y.1985) (Scheindlin, M.J.) ("It is axiomatic that a protective order may only be issued ... upon a showing of 'good cause.' ").

11. *See* 10/10/03 Ltr. ("The identity of persons with knowledge of any discoverable matter is precisely the kind of information the Federal

If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery.[9]

The moving party has the burden to demonstrate "good cause" for the protective order.[10]

## III. DISCUSSION

### A. The Interrogatories Are Proper

■ Underwriters first argue that plaintiffs must disclose this material pursuant to Rule 26(a)(1).[11] Underwriters are wrong. Plaintiffs need not disclose the identities of individuals called for by interrogatories 1(a) and 2(a) because they have "no intention of using that information—at trial or any other stage of the proceeding—to support [their] claims."[12] Rule 26(a)(1) requires parties, as a matter of course and before any discovery requests have been exchanged, to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party *may use* to support its claims or defenses."[13] Indeed, the Advisory Committee Notes specifically state that, under the 2000 amendments to Rule 26(a), "[a] party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use."[14]

Underwriters next argue that plaintiffs must produce the material pursuant to a discovery request made under Rule 26(b)(1), which requires production of "any matter, not privileged, that is relevant to the claim or defense of any party, including ... the identity and location of persons having knowledge of any discoverable matter."[15] That is

Rules require to be disclosed without ado in all cases.") (citing Fed.R.Civ.P. 26(a)(1)(A)).

12. 10/8/03 Letter from Melvyn I. Weiss, plaintiffs' liaison counsel, to the Court ("10/8/03 Ltr.").

13. Fed.R.Civ.P. 26(a)(1)(A) (emphasis added).

14. Advisory Committee Note to Rule 26(a)(1), 2000 Amendment.

15. Fed.R.Civ.P. 26(b)(1). *See* 10/10/03 Ltr. ("The identity of ... fact witnesses or 'occurrence witnesses' may 'always be obtained by discovery.' ")

precisely what Underwriters have done. There is no doubt that the information sought is relevant to plaintiffs' claims.

The only question is whether interrogatories 1(a) and 2(a) seek privileged matter or information otherwise warranting protection. If they do, then plaintiffs have shown "good cause" for the issuance of a protective order. Here, plaintiffs assert that the requested material is covered by the attorney work product doctrine, or should be protected as a matter of public policy.

## B. The Work Product Doctrine

### 1. Legal Standard

■ The work product doctrine, first articulated by the Supreme Court in *Hickman v. Taylor* [16] and later codified in the Federal Rules of Civil Procedure, protects from discovery all documents and materials prepared "in anticipation of litigation." [17]

> In performing his various duties ... it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.... This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed ... as the "work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness

and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.[18]

■ A party asserting the work product protection bears the burden of establishing all of its elements.[19] To wit, "[t]o invoke this privilege, a party generally must show that [the material sought was] prepared principally or exclusively to assist in anticipated or ongoing litigation." [20] The asserting party's burden cannot be "discharged by mere conclusory or *ipse dixit* assertions." [21]

### 2. The Work Product Doctrine Does Not Apply

■ The work product doctrine exists to protect materials created by an attorney in preparation for litigation; typically, the underlying factual matters are not protected.[22] Thus, for example, the work product doctrine might protect notes made by an attorney when interviewing witnesses. It does not, however, ordinarily protect the identities of those witnesses.[23] Moreover, unlike the attorney-client privilege, the work product protection is a qualified protection; it is not absolute. If the asserting party meets its burden of establishing the applicability of the work product doctrine, then that protection can be overcome by a showing that the party seeking discovery (1) has substantial need of the materials, and (2) that the party is unable, without undue hardship, to obtain the

(citing 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2013, at 199 (1994)).

16. 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

17. Fed.R.Civ.P. 26(b)(3).

18. *Hickman*, 329 U.S. at 510–11, 67 S.Ct. 385; *see also United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir.1998) (stating that work product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategies 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries" (quoting *Hickman*, 329 U.S. at 511, 67 S.Ct. 385)).

19. *United States v. Construction Prods. Research, Inc.*, 73 F.3d 464, 473–74 (2d Cir.1996).

20. *Id.* at 473.

21. *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224–25 (2d Cir.1984).

22. *See, e.g., Casson Constr. Co., Inc. v. Armco Steel Corp.*, 91 F.R.D. 376 (D.Kan.1980).

23. *See generally* Edna Selan Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine* 302–03 (1997).

substantial equivalent of the materials by other means.[24]

An exception to this qualified protection exists, however, for so-called attorney "opinion work product" or "core" work product—the mental impressions, conclusions, opinions or legal theories of opposing counsel—which are typically given the strongest work product protection.[25] The Federal Rules codify the special protection afforded opinion work product: "In ordering discovery of such [work product] materials when the required showing has been made, the court *shall* protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." [26]

Plaintiffs invoke the opinion work product doctrine, arguing that "[t]he Underwriter Defendants' request improperly seeks to examine counsel's thought process in weighing which information was to be included in the pleadings and which was to be excluded." [27] As they further explain, "[p]laintiffs assert the work product doctrine because the information Defendants seek is, in essence, the identities of witnesses interviewed by counsel in preparation of this litigation, and which therefore demonstrate which witnesses the plaintiffs value most highly." [28]

This argument, however, is the ubiquitous red herring.[29] Underwriters are *not* seeking the names of individuals interviewed by plaintiffs or relied upon in the complaint (although plaintiffs have already voluntarily disclosed the latter category). Rather, they are seeking the names of individuals who have personal knowledge of Tie-in agreements or Undisclosed Compensation. While plaintiffs undoubtedly have interviewed some of these people, there is no reason to believe they were all interviewed. A former employee of one of the Underwriters, for example, could have identified a number of client-investors who allegedly entered into Tie-in Agreements or paid Undisclosed Compensation, although those people were never interviewed by plaintiffs.

Notably, the cases on which plaintiffs principally rely stand only for the proposition that a party may not specifically demand the identities of witnesses interviewed or relied upon by counsel. In *In re MTI Tech Corp. Sec. Litig. II*,[30] plaintiffs produced a list of 71 witnesses as part of their Rule 26 initial disclosures. Defendants moved to compel plaintiffs to reveal which of those 71 individuals had been interviewed by counsel and provided anonymous source material for the complaint. The Court denied the motion, holding that the opinion work product doctrine protected plaintiffs from having to iden-

**24.** *See In re Grand Jury Subpoenas Dated Mar. 19, 2002, and Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir.2003) (citing Fed.R.Civ.P. 26(b)(3)). Although not central to my analysis, it should be noted that Underwriters can show a substantial need to know the identities of individuals who allegedly were required to enter into Tie-in Agreements and/or to pay Undisclosed Compensation. Indeed, Tie-in Agreements and Undisclosed Compensation comprise the central allegations in this case. *See In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d at 293 ("These cases allege a vast scheme to defraud the investing public. The scheme—characterized by Tie-in Agreements, Undisclosed Compensation, and analyst conflicts, and concealed by misrepresentations and omissions—was aimed at fraudulently driving up the price of stock in hundreds of companies in the immediate aftermarket of their initial public offerings.").

**25.** *See Hickman*, 329 U.S. at 510–13, 67 S.Ct. 385; *Upjohn Co. v. United States*, 449 U.S. 383, 400, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see also In re Grand Jury Proceedings (Duffy v. U.S.)*, 473 F.2d 840, 848 (8th Cir.1973) (stating that

opinion work product is "absolutely, rather than conditionally, privileged.").

**26.** Fed.R.Civ.P. 26(b)(3) (emphasis added).

**27.** *See* 10/8/03 Ltr.

**28.** 5/23/03 Letter from Melvyn I. Weiss to the Court, Ex. C to the 10/10/03 Ltr.

**29.** Red herring, the most oft-cited fish in American jurisprudence, have appeared in fifteen Supreme Court opinions, thirty-four Second Circuit opinions (fifty if unreported cases are included), and over one hundred district court opinions from within this circuit alone. Indeed, the 164 references to red herring in the Second Circuit are outnumbered only by the Seventh Circuit, which tips the scales with 254 red herrings. But that may be attributable to its proximity to the Great Lakes.

**30.** No. SACV 00–0745 DOC (ANX), 2002 U.S. Dist. LEXIS 13015 (C.D. Cal. June 14, 2002).

tity which of the 71 witnesses were the anonymous sources.

In this case, plaintiffs have not provided a list of potential witnesses, let alone one that includes everyone required to enter into tie-in agreements. Underwriters are simply asking for that list, not the subset of people interviewed by counsel. *MTI* is therefore inapposite. The other cases relied upon by plaintiffs are distinguishable on the same grounds.[31]

In sum, the information requested by Underwriters is not protected by the work product doctrine.[32]

## C. Public Policy

 Alternatively, plaintiffs claim that the public policy consideration of protecting corporate whistle-blowers provides "good cause" for the issuance of a protective order. In determining whether "good cause" exists, a court should balance the interests of the party seeking protection against those of the party seeking disclosure. I have constructed a list of factors that should inform a court's balancing of these interests. These factors include, but may not necessarily be limited to, the following:

1. *evidence of* "annoyance, embarrassment, oppression, or undue burden or expense;"[33]

2. how central (or tangential) the evidence sought is in relation to the central issues in the litigation;

3. the importance of the issues in the litigation to the public;

4. the parties' stakes in the outcome of the litigation;

5. whether the evidence sought is available from other sources; and

6. whether discovery of the evidence can be conditioned on terms that would alleviate the hardship in producing it.[34]

In this case, all of these factors weigh in favor of disclosure.

Here, plaintiffs principally argue that the threat of retaliation—a form of oppression—provides good cause. "The concern for retaliation [if the sources' names are revealed] when the allegations accuse virtually the entire Wall Street community of wrongdoing is particularly great for customers, employees or their business associates."[35] Plaintiffs

---

**31.** *See Electronic Data Sys. Corp. v. Steingraber,* No. 4:02 CV 225, 2003 WL 21653405 (E.D.Tex. July 9, 2003) (rejecting interrogatory that asked defendant to identify individuals who had been interviewed concerning the relevant allegations in the case); *In re Ashworth, Inc. Sec. Litig.,* 213 F.R.D. 385 (S.D.Ca.2002) (rejecting interrogatory that asked which of the individuals, identified in plaintiffs' initial disclosure, provided information used in framing the complaint).

**32.** Underwriters also contend that plaintiffs waived any work product protection when they agreed to "produce, by a reasonable date to be agreed, the identifying information sought by Interrogatories 1(a) and 2(a) propounded by the Underwriter Defendants on February 28, 2003 . . . ." Letter Agreement, Ex. E to the 10/10/03 Ltr. *See, e.g., In re Bristol–Myers Squibb Sec. Litig.,* 205 F.R.D. 437, 444 (D.N.J.2002) (enforcing discovery agreement and observing that "[i]t is essential to our system of justice that lawyers and litigants, above all, abide by their agreements . . . ."). Despite its broad language, however, there is evidence to suggest that the parties may have intended to confine the disclosures made pursuant to the Letter Agreement to the names of individuals who provided source material for the pleadings. *See* 9/29/03 Oral Argument Transcript ("Tr.") at 33–36. If that was the case, then the Letter Agreement would not constitute a waiver. In any event, because I find that the material in question is not covered by the work product protection, there is no need to reach the issue.

**33.** Fed.R.Civ.P. 26(c).

**34.** The Third Circuit has articulated a slightly different test. *See Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir.1995) (listing the following factors: "1) whether disclosure will violate any privacy interests; 2) whether the information is being sought for a legitimate purpose or for an improper purpose; 3) whether disclosure of the information will cause a party embarrassment; 4) whether confidentiality is being sought over information important to public health and safety; 5) whether the sharing of information among litigants will promote fairness and efficiency; 6) whether a party benefitting from the order of confidentiality is a public entity or official; and 7) whether the case involves issues important to the public.") (citing *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 787–91 (3d Cir.1994)).

**35.** 10/8/03 Ltr. *See also* Tr. at 40 (Statement of Melvyn I. Weiss) ("There is intimidation going on in a lot of different ways, and I don't like it."). But no such incidents have been disclosed to the Court.

point to the Sarbanes–Oxley Act of 2002 [36] and to the Second Circuit's recent decision in *Novak v. Kasaks* [37] as evidence of a trend in favor of protecting corporate whistle-blowers. The Sarbanes–Oxley Act prohibits retaliation against corporate whistle-blowers; [38] *Novak* held that securities fraud pleadings need not reveal the identity of confidential sources. [39]

The issue here does not raise the policy concerns addressed in the Sarbanes–Oxley legislation or the *Novak* rule, both of which encourage whistle-blowers to expose corporate wrongdoing by protecting them from retaliation. Once a litigation is pending, the balance of interests change. While it is important to protect whistle-blowers, it is also important, once the whistle is blown, to allow all parties an equal opportunity to engage in the robust discovery permitted by the Federal Rules.

Plaintiffs' claim that identification of those who entered into Tie–In Agreements and/or paid Undisclosed Compensation will lead to retaliation is not supported by any evidence. In fact, on July 31, 2003, plaintiffs provided the names of twenty-three customer-investors who engaged in Tie-in Agreements and paid Undisclosed Compensation, *and* who provided support for plaintiffs' pleadings. [40] Three months have passed since that disclosure and plaintiffs have not notified the Court of any retaliation or threats. Underwriters have even less incentive to retaliate against the investors whose identities are now sought, particularly in view of plaintiffs' counsel's representation that these customers will not be called (by plaintiffs) as witnesses. [41] Thus, plaintiffs have failed to show the "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements," that is necessary to support a showing of good cause. [42]

Nor do the other factors, enumerated above, support the issuance of a protective order. The investors whose identities are sought have allegedly engaged in Tie-in Agreements or paid Undisclosed Compensation. Although there may be some circumstances where public policy will protect the identity of potential witnesses, the required balancing of interests tips in favor of disclosure when those potential witnesses have information regarding the central allegations in the case.

These cases are also of great import to the public. They raise questions regarding the integrity of the market that created the "tech boom" of the late 1990s and the resultant "dot.com crash." The investing public's enormous interest in discovering whether or not that market was manipulated weighs in favor of disclosure.

The interest to Underwriters is no less significant. Plaintiffs seek millions, if not billions, of dollars in damages. Indeed, plaintiffs have already reached a tentative agreement with the issuer defendants to settle these cases for *at least* one billion dollars. [43] The non-economic interests are also considerable. Plaintiffs question the validity of certain routine underwriting practices; an adverse result could force a sea change in the way that firms underwrite securities. These stakes are high, and militate in favor of permitting the requested discovery.

Practically speaking, there is no other source for this information. Although plaintiffs argue that Underwriters are in the best position to know which of their customers were required to enter into Tie-in Agreements or to pay Undisclosed Compensation, [44] Underwriters cannot be required to survey all of their customers. [45] Moreover, plaintiffs'

**36.** Pub.L. No. 107–204, 116 Stat. 745 (2002).

**37.** 216 F.3d 300.

**38.** *See* 18 U.S.C. § 1514A.

**39.** *See* 216 F.3d at 313.

**40.** *See* 7/31/03 Letter from Robert A. Wallner to Gandolfo V. DiBlasi, Ex. E to 10/10/03 Ltr.

**41.** *See* 10/8/03 Ltr.

**42.** *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

**43.** *See* Mark Hamblett, *$1B Settlement Reached in Suits Stemming from Tech IPOs*, N.Y.L.J., June 27, 2003, *available at* www.law.com.

**44.** *See* 10/8/03 Ltr.

**45.** *Cf. In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 631, 637 (N.D.Ga.2002) ("Plaintiffs' suggestion that Defendants should survey all of their

argument presumes the truth of their own allegations. But if there were no Tie-in Agreements or Undisclosed Compensation, Underwriters certainly could not identify individuals required to engage in them. Plaintiffs are the best, and possibly only, source for this information.

Finally, the parties have agreed to treat the identities of these customers as confidential, meaning that the information requested will only be shared with counsel (including in-house counsel) and certain limited non-legal personnel, "[p]rovided that reasonable precautions are taken to protect against the Information's disclosure to those employed by [Underwriters] who directly engage in or oversee the [Underwriter]'s business with customers." [46] The parties, in other words, have already addressed plaintiffs' confidentiality concerns.

Accordingly, the balance of interests does not warrant the requested protective order. Pursuant to an ongoing commitment to maintain confidentiality, plaintiffs must respond to the Underwriters' interrogatories.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion for a protective order is denied. Plaintiffs must serve answers to interrogatories 1(a) and 2(a) upon Underwriters on or before November 10, 2003. Those answers are subject to the confidentiality agreement contained in the parties' July 10, 2003, Letter Agreement.

---

customers ... is not a substitute for discovering the witnesses upon whose information Plaintiffs based their allegations.").

**46.** *See* Letter Agreement, Ex. E to 10/10/03 Ltr.