Wilson, J.
(dissenting). The Fourth Amendment to the US Constitution, urged on the nation by the New York ratifying convention in 1788 (William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791 695 [1st ed 2009]), secures us against unreasonable searches and seizures by our government. It reflects the American consensus that the general warrants and writs of assistance popular among British officials in colonial government — orders that licensed their possessors to scour homes and businesses for anything of potential interest to the Crown, and that were a significant provocation to the revolutionary sentiment then taking hold in New England — had no place in a nascent republic that so deeply abhorred arbitrary power.[1]
The amendment’s effect is “to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority” (Weeks v United States, 232 US 383, 391-392 [1914]).[2] Although the Supreme Court initially interpreted those limits as applying to searches of material things only (Olmstead v United States, 277 US 438 [1928]), it has, since Katz v United States (389 US 347 [1967]), extended the protections to communications in which one has a reasonable expectation of privacy.
Although the framers of the US Constitution knew only the technologies of the 1780s, the framers of the New York Constit *257 ution’s provision against unreasonable searches and seizures worked 150 years later and knew more. Our State Constitution, unlike its federal counterpart, includes explicit protections against unreasonable searches and seizures of electronic communications (NY Const, art I, § 12).
In 1938 — after an “epochal debate” among the delegates to that year’s constitutional convention that aroused the interest of newspaper editorial boards, the letter-writing public, the Governor, and a slew of labor organizations and law enforcement officers (1 Revised Record of the Constitutional Convention of the State of New York at 553, 555 [1938]) — the People approved what became article I, § 12. That section did not merely incorporate verbatim the protections of the Fourth Amendment, but expressly extended those protections to telecommunications. The delegates who drafted section 12, whose discussions thereof stretched over more than three weeks of the convention and nearly five hundred pages of the revised record of its proceedings, agreed that technological advances (whether the telegraph using radio waves, the telephone using copper wires or, by extension, the Facebook message using fiber-optic cable or a different frequency of the radio spectrum) are entitled to the same protections as their more ancient but analogous precursors (1 Revised Record at 340, 530).[3] They were also clear that New Yorkers retain a reasonable expectation that materials will remain private from the government even if they are divulged to their intended recipients, to third parties incident to the means of communication (such as a telegraph operator), or to a wide universe of friends and neighbors sharing a party line (1 Revised Record at 541, 558).[4]
*258 In fact, several prominent delegates thought searches and seizures of telecommunications should be subject to a higher standard of review than searches of physical property precisely because those searches were sure to compromise the privacy of other people. Those delegates quoted approvingly from Justice Brandéis’ prescient dissent in Olmstead:
“The evil incident to invasion of the privacy of the telephone is far greater than that involved in tampering with the mails. Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded, and all conversations between them upon any subject, and although proper, confidential, and privileged, may be overheard. Moreover, the tapping of one man’s telephone line involves the tapping of the telephone of every other person whom he may call, or who may call him. As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire tapping.” (277 US at 475-476.)
The New York Constitution commands us to guard vigilantly against that evil. We have done so on many occasions by interpreting our own Constitution to provide greater protections than the Fourth Amendment when circumstances warrant (People v Weaver, 12 NY3d 433, 445-446 [2009] [collecting cases]).
Here, we are asked to decide whether a federal statute, the US Constitution, the New York Constitution, and the law of New York offer Facebook any meaningful recourse against a warrant authorizing the seizure of private information en masse. The facts are these: On the basis of a single 93-page affidavit (not subsequently shown to Facebook, or to its users *259 whose files were seized, or to the Appellate Division, or to this Court), Supreme Court issued 381 warrants. Those bulk warrants authorized the seizure of what the District Attorney tepidly describes as “specified categories of information,” but which functionally amounts to 381 users’ entire histories on the platform. At least several of the users were high school students who are unlikely to have themselves been suspects in the investigation. The warrants compelled Facebook to produce not only any and all text, photos, or videos a user had shared with her limited universe of friends, but also any private messages exchanged between the user and another individual (who could have been a spouse, doctor, religious figure, or attorney), as well as information the user had chosen to no longer share with anyone, such as a previous email address, a deleted friend, or a hidden post, and information the user had never intended to share with anyone, such as her searches and location. It also compelled Facebook to produce content shared by users who were not named in the 381 warrants, and may not even have known anyone named in the 381 warrants, but had the misfortune of posting on the timelines of those users, uploading photos of those users, or simply belonging to any one of the groups with which a named user was affiliated.[5]
Facebook, which receives tens of thousands of requests from U.S. law enforcement officials each year and claims that it willingly complies with the vast majority of them (Facebook Government Requests Report, https://govtrequests.facebook. com/country/United%20States/2016-Hl/ [accessed Mar. 3, 2017]), repeatedly attempted to negotiate a narrower inquiry with the District Attorney’s office. Rebuffed, Facebook moved the issuing court to quash the warrants. That court denied the motion, holding that Facebook lacked standing to quash the warrants and that the warrants were, in any case, supported by probable cause. The court ordered Facebook to comply with the warrants immediately. Facebook appealed that order and sought a stay pending appeal. After the Appellate Division denied Facebook’s application for a stay, Facebook complied with the warrants. The Appellate Division dismissed Face-book’s appeals on the ground that they were taken from non-appealable orders, but nonetheless appeared to agree with the summary denial of Facebook’s motion for lack of standing. We *260 granted Facebook leave to appeal, and now affirm on the grounds that the orders are non-appealable.[6]
Because the denial of the motion to quash is appealable, and because Facebook clearly has standing to move to quash, I respectfully dissent and would remand the case to the Appellate Division to resolve the motion to quash on the merits.
I. Appeal Pursuant to the Stored Communications Act
Despite the significant search and seizure issues it presents, the most straightforward way to resolve this case turns not on the state or federal constitutions, but on a federal statute, squarely invoked by Facebook, that simultaneously authorizes the government’s warrants and confers on service providers— such as Facebook — a right to move to quash those warrants. That statute confers both standing and a freestanding cause of action as to which normal federal rights of appeal apply.
The majority construes my dissent as “rely[ing] on [the] flawed” conclusion “that an SCA ‘warrant’ is equivalent to an ‘administrative subpoena,’ despite the clear and unmistakable distinction between the two” in the statute. That is not right. First, as explained in part I (a), 18 USC § 2703 (d) concerns all “orders,” so that the difference between a warrant and a subpoena is irrelevant to the statutory cause of action provided for by Congress. Second, even in part I (b) and (c), in which I discuss appealability without regard to the statutorily-created cause of action, I do not conclude that SCA warrants and administrative subpoenas are always the same. Instead, under both federal and New York law, the appealability of warrants and subpoenas is not determined by their formal name, but by *261 the circumstances under which they are issued — most importantly, whether there is a pending criminal action or merely an investigation.
An appeal from the statutorily-granted motion to quash is not an appeal in a criminal proceeding,[7] but in a separate proceeding authorized by statute. The grant or denial of the motion to quash is a final decision, not an interlocutory decision in a criminal proceeding, and is appealable as of right by either party. Because they have mistakenly assumed that the federal statute’s incorporation of state-law procedures for issuing warrants converts the federal statutory action into a traditional state-law warrant, and then applied the “warrant” label without regard to the circumstances present, the majority and the Appellate Division have characterized this appeal as taken from a non-appealable order.
Very simply, because Congress granted service providers a statutory right to move to quash, it automatically provided standing and a right to appeal, absent a clear statement to the contrary.
a. The SCA Provides Facebook With the Right to Bring a Separate Action to Move to Quash, Including the Right to Appeal
Both parties to this action agree the bulk warrants served on Facebook were issued pursuant to section 2703 (a) of the SCA. The SCA provides statutorily-based quasi-Fourth Amendment protections to information sent to electronic communications and remote computing services. The act, which also sets out procedures through which a governmental entity may compel such a service to disclose that information, was designed to “protect legitimate law enforcement needs while minimizing intrusions on the privacy of system users as well as the business needs of electronic communications system providers” (132 Cong Rec S7987-04 [June 19, 1986] [emphasis added]).[8]
*262 It accomplishes that balance by providing law enforcement officers with federal statutory authority to compel a third party (such as Facebook here) to execute a legitimate search and seizure, while simultaneously granting service providers a federal right to move to quash or modify problematic orders (18 USC § 2703 [d]).
The parties do not contend, and the majority does not hold, that the section 2703 (d) right to move to quash or modify an order is available only to those providers served with court orders issued pursuant to section 2703 (b) or (c), and not to those providers, like Facebook, served with warrants under section 2703 (a). Although the opening sentences of section 2703 (d) contain specific provisions that relate only to court orders issued under subsections (b) and (c), the sentence that grants providers a statutory right to move to quash includes all court orders issued “pursuant to this section,” i.e. pursuant to section 2703 generally — not only orders issued under subsections (b) or (c).[9] The SCA plainly distinguishes between sections and subsections, and there is no indication that Congress intended for “sections” to be treated as “subsections.”
Indeed, to so hold would be to ignore the plain language of the SCA in contravention of the rules of statutory interpretation. Other courts presented with section 2703 (d) motions to quash or modify section 2703 (a) warrants have uniformly held that the statute authorizes a service provider’s motion (see e.g. In re Search of Google Email Accounts, 99 F Supp 3d 992 [D Alaska 2015]; In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp., 15 F Supp 3d 466 [SD NY 2014]).[10]
Service providers can invoke the protections of section 2703 (d) if they have been compelled to disclose an unusual volume *263 of their users’ content or to comply with an order that would otherwise unduly burden them. As Facebook and amici argue, and as the Eastern District of New York concluded (In re Apple, Inc., 149 F Supp 3d 341, 368-373 [ED NY 2016]),[11] undue burdens are not limited to the direct administrative costs of compliance (for which the government must reimburse companies under section 2706). Compelling a company to disclose the *264 private information of its customers may tarnish its brand or alienate its current or future users, which could constitute an undue burden when evaluated against the scope of the request and its potential benefit to the prosecutor. As the Third Circuit noted in Pen Register, “[w]ithout a prior hearing, a district court is not likely to learn that [an] . . . order is too burdensome until after the company has carried out the order. A prior hearing could have the further value of allowing the district court to restrict any excessively burdensome order sufficiently to make it valid” (610 F2d at 1157).
Because Facebook is a “service provider” as defined in the SCA and has alleged that the bulk warrants were unusually voluminous, and because the difference between conducting a targeted search and seizure instead of an overbroad one could make a material difference to the burden imposed on its business, Facebook’s resort to its federal statutory right to move to quash under section 2703 (d) can neither be dismissed for lack of standing nor denied on the merits, even assuming sufficient probable cause existed to justify issuance of the warrants.
Facebook has a federal right to appeal an adverse decision on its motion to quash. Had the District Attorney gone to federal court with his affidavit, as the SCA allows, the district court’s ruling on Facebook’s motion to quash would have been appealable to the U.S. Court of Appeals for the Second Circuit.[12] The Federal Courts of Appeals generally have jurisdiction over appeals from all final decisions of the district courts (28 USC § 1291). State rules of procedure applicable to garden-variety warrants cannot be used as a device to contravene or frustrate federal law.
b. Even Apart from the SCA, Federal Law Would Allow Face-book to Appeal the Denial of its Motion to Quash
Even putting aside the statutory authorization granted to a service provider to move to quash an SCA warrant, and the concomitant right to appeal, federal law recognizes a fundamen *265 tal difference between orders compelling a third party to produce information as part of an investigation, and orders compelling a third party to produce information once a criminal proceeding has commenced. Although subpoenas issued in connection with pending litigation or the grand jury process are not normally considered final (United States v Ryan, 402 US 530, 532-533 [1971]), and even nonparties to those proceedings who wish to obtain immediate appellate review of a subpoena must first defy the order, be held in contempt, and then appeal the contempt order (id. at 532), that rule is inapplicable to district court orders enforcing a subpoena issued by a government agency in connection with an investigation.
Whereas the Ryan rule is designed to discourage (but not bar) appeals that would temporarily halt the litigation or grand jury process, here,
“at least from the district court’s perspective, the court’s enforcement of an agency subpoena arises out of a proceeding that ‘may be deemed self-contained, so far as the judiciary is concerned . . . [T]here is not, as in the case of a grand jury or trial, any further judicial inquiry which would be halted were the offending [subpoenaed party] permitted to appeal’ ” (Construction Prods., 73 F3d at 469, quoting Cobbledick v United States, 309 US 323, 330 [1940]).
The Second Circuit has employed the same reasoning to allow the immediate appeal from an order enforcing an arbitrator’s subpoena (Dynegy Midstream Servs. v Trammochem, 451 F3d 89, 92-94 [2d Cir 2006] [allowing appeals from independent proceedings in which “a party comes to federal court for the sole purpose of asking the court to issue an order” and dismissing appeals from orders “embedded ... in the midst of ongoing litigation in the district court”]). Other circuits have allowed the appeal of independent proceedings involving administrative search warrants (Babcock & Wilcox Co. v Marshall, 610 F2d 1128 [3d Cir 1979]; United States v Stauffer Chem. Co., 684 F2d 1174 [6th Cir 1982]).
That conclusion, which tracks to a considerable extent our own jurisprudence allowing the appealability of an order resolving a nonparty’s motion to quash a subpoena issued prior to the commencement of a criminal action, is further bolstered by the SCA’s explicit support for Facebook’s right to move to quash *266 an order. The Supreme Court has been reluctant to close the doors of the Courts of Appeals to those whose appeal from compulsion rests on statutory provisions (Cobbledick, 309 US at 329).
c. State Rules of Procedure Cannot Eliminate a Federal Right
The New York Criminal Procedure Law cannot and should not extinguish a service provider’s federal right to a fully adjudicated motion to quash, even if that motion is pursued — at the choice of the government — in state courts. To hold otherwise is to contravene both the language and the remedial and deterrent purposes of the SCA, which here would deprive Facebook of its only avenue to challenge a potentially significant harm.
Although the SCA incorporates state rules governing the issuance of the bulk warrants (18 USC § 2703 [a]),[13] the warrants here are federal warrants issued pursuant to federal statutory law — not New York State law — and no provision of the SCA adopts or references state-law procedures for the ap-pealability of SCA warrants. Nor does any portion of the legislative history suggest that Congress intended to leave ap-pealability of SCA warrants to the vicissitudes of the appeal-ability rules of the several states. It is implausible that Congress, which carefully balanced section 2703 (a)’s grant of power with section 2703 (d)’s check on the same, intended to allow prosecutors to forum shop for the court with the rules of procedure that would best evade the statutorily-granted quasi-Fourth Amendment protections. When a service provider moves to quash under section 2703 (d), it has initiated a collateral, civil proceeding that gives rise to a final order subject to federal rules of appeal. Even were that not so, the SCA would preempt CPL article 450 when an SCA warrant is involved, requiring us to apply the federal rules for interlocutory appeals in this *267 case involving a federal right.[14] But either way, Congress’ direction must be honored.
Finally, this appeal is the only opportunity to litigate fully the rights Congress granted to Facebook. The grounds underlying at least one portion of Facebook’s motion to quash are specific to Facebook, not its users, and Facebook is before us to defend not only the constitutional rights of its users (where the majority has focused its analysis), but also its own business interests.[15]
Even if those users could realistically seek relief for their own injuries through pretrial suppression hearings or 42 USC § 1983 suits — which the majority believes (majority op at 251), but I dispute (part III [c], infra) — Facebook will not be a party to those actions and the hypothetical resolution of their claims would not address or remedy Facebook’s injuries. The majority does not suggest an alternative means for the *268 company to vindicate its right to be free of unusually voluminous or unduly burdensome requests.[16]
Congress granted service providers their own full day in court, in a completely collateral proceeding subject to normal federal appealability rules. The denial of Facebook’s motion to quash cannot be defeated by applying state-court rules of ap-pealability governing garden-variety New York warrants to SCA warrants issued under federal statutory authority.
This Court should be wary of once again deciding that even a neutral state rule regarding the administration of the courts is a valid excuse for refusing to fully entertain a federal cause of action. It was only eight years ago that the Supreme Court reversed us and admonished that a state “jurisdictional rule cannot be used as a device to undermine federal law” (Haywood v Drown, 556 US 729, 739 [2009]). Instead, “[federal law takes state courts as it finds them only insofar as those courts employ rules that do not ‘impose unnecessary burdens upon rights of recovery authorized by federal laws’ ” (Felder v Casey, 487 US 131, 150 [1988], quoting Brown v Western R. Co. of Ala., 338 US 294, 298-299 [1949]).
II. Appeal Pursuant to the Common Law
Even if the SCA did not confer a right to appeal (that is, even if New York law governed appealability), Facebook could appeal Supreme Court’s order, which is analogous to an order denying a motion to quash a subpoena in a criminal investigation, under the common law of New York State.[17]
The majority and I agree on the framework used to resolve that issue. As their opinion sets out in more detail, it is a *269 fundamental precept of the jurisdiction of our appellate courts that “ ‘[n]o appeal lies from a determination made in a criminal proceeding unless specifically provided for by statute’ ” (People v Lovett, 25 NY3d 1088, 1090 [2015], quoting People v Pagan, 19 NY3d 368, 370 [2012]). However, I believe the majority has misconstrued the authority it cites for the proposition that “while a subpoena does not commence a criminal proceeding . . . , the issuance of a warrant. . . does just that.”
The majority starts by citing CPL 1.20 (18), which states: “ ‘Criminal proceeding’ means any proceeding which (a) constitutes a part of a criminal action or (b) occurs in a criminal court and is related to a prospective, pending or completed criminal action, either of this state or of any other jurisdiction, or involves a criminal investigation.” That section does not distinguish between subpoenas and warrants, and therefore does not support the majority’s proposition.
The majority next cites Cayuga Indian Nation of N.Y. v Gould (14 NY3d 614 [2010]). That case squarely contradicts the majority’s holding here. In Cayuga Indian Nation, several district attorneys served warrants on the Nation, concerning possible prosecutions for the unlawful sale of cigarettes. The next day, the Nation filed a declaratory judgment action contending that the district attorneys “lacked the power to obtain a search warrant or seize property and demanded the return of the confiscated items” (id. at 631). We recognized that “[t]he general rule is that, once a criminal action has been initiated, a criminal defendant may not bring a declaratory judgment action to raise a statutory interpretation or other issue that can be adjudicated in the criminal prosecution” (id. at 633). The district attorneys sought to dismiss the declaratory judgment motion, arguing that “under the Criminal Procedure Law, the filing of a search warrant application commences a ‘criminal proceeding’ (see CPL 1.20 [18] . . . )” (id. at 634). We rejected the district attorneys’ argument, and allowed the Nation to proceed, holding the following, which directly contradicts the majority’s position here:
“Our holding in Kelly’s Rental did not expand the rule precluding the use of declaratory judgment actions to encompass situations like this one where a search warrant application was executed but no party was named as the defendant and no accusatory instrument had been filed against any person *270 or company at the time civil relief was sought. A search warrant often targets a place without identifying a defendant. As such, it is not accurate to say that, in every case where a search warrant application has been filed, a criminal prosecution has been commenced, particularly since a warrant may be requested long before a decision is made to file criminal charges. A party is not categorically precluded from initiating a declaratory judgment action based on nothing more than the execution of a search warrant when the issue to be raised involves a pure question of law — such as a query concerning the scope and interpretation of a statute or a challenge to its constitutional validity— and the facts relevant to that issue are undisputed, as they are here. Because no criminal action had been initiated against any identified party at the time this declaratory judgment action was commenced, the decision whether the action could be entertained fell soundly within the realm of discretion possessed by the lower courts and we discern no abuse of that discretion in the denial of the motion to dismiss.” {Id. at 634-635.)
The majority finally relies on Matter of B. T. Prods. v Barr (54 AD2d 315, 319 [4th Dept 1976], affd 44 NY2d 226 [1978]). There, pursuant to a warrant, the Organized Crime Task Force seized all of B. T. Productions’ records for a two-year period. B. T. Productions sought a writ of prohibition, contending that the Task Force lacked the authority to do so. We affirmed B. T. Productions’ right to proceed with its writ of prohibition, writing:
“In most cases, prohibition will not be available to challenge the validity of a search warrant. For one thing, it will lie only if the challenge, as in the present case, goes to jurisdiction rather than simply to the existence of probable cause in a particular situation. Of equal significance is the fact that in the typical case there will exist an adequate alternative remedy. A search warrant is most often used to obtain evidence in the course of a criminal investigation of a particular crime, an investigation which will soon eventuate in a criminal proceeding. In such cases, the validity of the search warrant will *271 of course be subject to challenge by means of a motion to suppress, the denial of which is appealable in the context of an appeal from the resultant conviction. Here, however, there is no prosecution, and there is no indication that there ever will be a prosecution, and thus there is no opportunity for a motion to suppress. To allow the failure to prosecute, a failure which may well be due to the absence of sufficient grounds to prosecute, to serve as a shield for the allegedly illegal seizure and retention of private property by government agents would be to make a mockery of justice. This is indeed a proper case for application of the just and ancient writ of prohibition.” (44 NY2d at 233.)
Far from supporting the proposition that the issuance of a warrant always commences a criminal proceeding, whereas the issuance of a subpoena does not, the majority’s precedents establish three propositions contrary to its holding today: (1) the issuance of a warrant does not always bar the warrant’s target from commencing a collateral proceeding to attack it; (2) so long as “no criminal action had been initiated against any identified party,” challenges to the warrant need not be restricted to the forthcoming criminal prosecution; and (3) when the target of the warrant is not the target of the potential prosecution, that person will have no “adequate alternative remedy” other than a collateral challenge to the warrant, which cuts sharply in favor of entertaining the challenge to the warrant.
Because the majority has interpreted our precedents to state an inflexible rule that does not, until now, exist, it should hardly be surprising that a “formidable line of authority” allows the direct appeal of orders granting or denying motions to quash subpoenas, even those issued in criminal investigations if prior to the commencement of a criminal action (Matter of Cunningham v Nadjari, 39 NY2d 314, 317 [1976]). Such motions, we have reasoned, are not made in a criminal proceeding. Rather, they are final orders in special proceedings on the civil side of a court vested with civil jurisdiction (id.).
Those precedents are indistinguishable from Facebook’s situation, unless one woodenly applies “warrant” and “subpoena.” For example, in Matter of Abrams (John Anonymous) (62 NY2d 183 [1984]), we held that recipients of subpoenas issued by the Attorney General, in furtherance of a criminal ticket-scalping investigation, could move to quash the subpoenas, which deci *272 sion was appealable, even though the recipients themselves (unlike Facebook here) were the targets of the investigation. In Matter of Boikess v Aspland (24 NY2d 136 [1969]) we entertained the appeal of motions to quash subpoenas issued as part of a criminal investigation of marijuana use by Stony Brook professors. Again, the subpoena targets were themselves the potential criminal defendants, which is not the case here.
In determining whether proceedings should be properly characterized as civil or criminal, this Court has eschewed a label-based test and instead consistently adhered to looking “to the true nature of the proceeding and to the relief sought” (Abrams, 62 NY2d at 191).[18] The majority applies this test and concludes that the SCA bulk warrants operate more like traditional search warrants than like the subpoenas at issue in People v Doe (272 NY 473 [1936]) and its progeny. Here, the majority and I part ways.
The SCA warrants operate more like subpoenas than like traditional search warrants in several significant, and determinative, respects.[19] First, rather than permitting state actors to seize property or private information directly, as traditional warrants do, the SCA warrants compel a third party (Face-book) to expend resources producing documents for an investigation. Second, unlike traditional warrants, service providers are not the targets of, or in any way involved in, the underly *273 ing investigation but are instead the neutral repositories of electronic information. Third, service providers must preserve information pending the resolution of a motion to quash (18 USC § 2703 [f]). As a result, SCA warrants can be challenged before compliance, and the results of that challenge can be appealed, without tipping off the subjects of the investigation or otherwise compromising the State’s interest in the preservation of evidence. Fourth, our legal system is based on the adversarial process. Ex parte proceedings are a sharp departure from the norm, permissible only when required by exigent circumstances. Such circumstances, often present in the case of traditional warrants, are absent here. The District Attorney, who argued at Supreme Court that the notice provisions governing traditional search warrants under CPL 690.50 did not apply to SCA warrants because of the unusual manner in which those warrants were issued and executed, recognized that the 381 orders at issue here operated more like subpoenas than warrants in some respects.[20] Indeed, the fact that parallel provisions of the SCA contemplate allowing the government to subpoena, without notice to Facebook’s customers, nearly all of the material it requested is fatal to the District Attorney’s effort to distinguish the true nature of the two types of order (§§ 2703 [b] [1] [B] [i]; 2705; see Microsoft, 829 F3d at 227 [Lynch, J., concurring]).
The execution of SCA warrants so closely resembles the execution of traditional subpoenas and civil document requests that no other aspects need to be considered.[21] Nevertheless, the prior cases and the parties suggest several other factors that bear on an Abrams-like inquiry into whether the underlying proceeding is more criminal than civil in nature. Those factors also tend to support the conclusion that Facebook has a right to appeal.
Abrams itself focused on whether the contested motion could arise in the context of a purely civil suit and on whether the *274 relief sought had anything inherently to do with criminal substantive or procedural law (as well as on the uncertainty that criminal charges would ever be filed against particular respondents, discussed infra at n 22) (.Abrams at 193-194). Because the SCA warrants are substantively identical to subpoenas, and because motions to quash subpoenas arise and are relieved in civil suits, Facebook satisfies Abrams’ test. Although the relief Facebook seeks may include a review of a court’s determination of probable cause, that review is not inherent in its motion to quash, which a court could grant because of a determination that the warrants injured Face-book’s business interests in a manner that had nothing to do with criminal substantive or procedural law. Indeed, the issue properly before us on appeal is whether Facebook can appeal a determination that it lacked standing to move to quash the warrants. That jurisdictional determination has nothing to do with the criminal law and can be appealed and settled without reviewing issues of probable cause, causing substantial delay, or giving rise to interminable interlocutory appeals.
The contention that an SCA warrant is not “civil by nature” because it commences a criminal proceeding under CPL 1.20 (18) and can be issued only to a governmental entity upon a showing of probable cause misses the point. The question is not whether the warrant itself was issued in a criminal proceeding, but whether the motion to quash gave rise — as so often under Doe and its progeny — to a civil proceeding, with its own index number, collateral to and discrete from the criminal one that birthed it. That is precisely what happened here.
The District Attorney’s argument that the text of the statute refers to section 2703 (a) orders as warrants, and that the Second Circuit has found Congress intended them to be treated as warrants, is also unpersuasive. Although the Second Circuit is not required to adopt Abrams’ anti-textualist approach, our long-standing practice requires we abjure simple heuristics and instead determine the true nature of the proceeding. Furthermore, the nature of the SCA bulk warrants was a close question for that court (see Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp., 855 F3d 53, 60-62 [2d Cir 2017, Jacobs, J., dissenting]; 855 F3d 53, 62-68 [Cabranes, J., dissenting]; 855 F3d 53, 69-74 [Raggi, J., dissenting]; 855 F3d 53, 74-76 [Droney, J., dissenting] ; see also In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp., 15 F Supp 3d at *275 471 [calling the order “a hybrid: part search warrant and part subpoena”]), and Judge Carney’s majority opinion turned in significant part on her finding that the SCA’s primary emphasis was on protecting user content (Microsoft, 829 F3d at 201, 205-206, 217-219, 222; Microsoft, 855 F3d at 55-60). In Microsoft, the statute’s purpose was served by finding section 2703 (a) orders were issued like warrants for the purposes of extraterritorial application; here, it is served by recognizing those orders are executed like subpoenas for the purposes of motions to quash.
An unstated common practice behind our precedents supports Facebook’s right to appeal. Although our series of short memoranda affirming or denying leave to appeal have not offered explicit and extensive guidance on how to determine whether an underlying proceeding is more criminal or civil in nature, a line of Appellate Division cases invoked by Facebook suggests the pivotal consideration is whether “the denial of an appeal ... at this juncture would irrevocably preclude [a party] from any opportunity to vindicate its position before an appellate body” (People v Marin, 86 AD2d 40, 42 [2d Dept 1982]). Those cases create a dichotomy between (a) appeals where “either of the immediate parties to an underlying criminal action” can continue to contest “the propriety of an order ... on the direct appeal from any resulting judgment of conviction” and (b) appeals by innocent third parties who would have no other day in court (id.). A survey of the cases resolved by this Court suggests the rule ascribed to us by the Appellate Division not only squares with traditional notions of justice but also has considerable predictive power.[22] Because Facebook is here to protect its own rights, not only the rights of its users, *276 and because no one contends it will have any other opportunity to assert its own rights on appeal, it should be able under the New York common law to present the case for its motion to quash before the Appellate Division — and, if necessary, before this Court.
If it cannot, there will be no opportunity for the Appellate Division or this Court to harmonize the decisions of our trial courts with one another, with our interpretation of the law, or with the requirements of the SCA — forcing the federal due process and New York constitutional issues on the Court.
III. Standing under the SCA and the Common Law
Because Facebook is entitled to appeal Supreme Court’s denial of its motion to quash under the SCA and New York common law, the issues of its standing to challenge the bulk warrants and of the propriety of the SCA warrants themselves were properly before the Appellate Division. Because the former issue is a question of law adequately briefed by both parties, I conclude that Facebook has standing to assert its own rights under the SCA, its own rights under the common law, and the rights of its users under the traditional test for third-party standing.
*277 I would remit the case to the Appellate Division to evaluate the merits of Facebook’s motion to quash, and neither have nor should have any view on the merits determination.
a. SCA Standing
Section 2703 (d) grants service providers a right to move to quash or modify warrants (part I, supra). Thus, to determine standing, a plaintiff need only allege that it is a “service provider” as defined by the statute. No one disputes that Face-book is a service provider. Therefore, the statute itself establishes Facebook’s standing to file a motion to quash, in which it can argue the warrants are unusually voluminous and/or unduly burdensome.[23]
b. Common-Law Standing
Even if section 2703 (d) did not exist, or it was interpreted to extend to subpoenas only and not warrants, Facebook laid out a prima facie case that compliance with the court order would injure it. That injury establishes standing.
The most straightforward injury is the administrative cost of gathering the required information. Facebook and the amici supporting its position advance this interpretation, and Face-book’s briefs here and in the Appellate Division state that the company was forced to conduct a burdensome search and seizure of an extensive number of accounts. Facebook has consistently criticized the volume of information demanded by these warrants. For instance, Facebook, which receives and complies with tens of thousands of law enforcement requests each year, informed Supreme Court that this set of 381 warrants exceeded by more than tenfold the largest number of warrants the company had ever received in a single investigation. Each warrant also requested a considerable volume of information, from an extensive number of places around the site, and unbounded by time or type of content. Whether that administrative cost is sufficiently great to require some or all of the warrants be quashed or modified is not the relevant question; the existence of even slight injury suffices to create standing.
*278 Furthermore, as Facebook and amici also maintain, the direct administrative costs of compliance are not the only-potential injuries at play here. Facebook argued in Supreme Court that aiding the government in trampling the Fourth Amendment rights of its users would be a breach of the legal obligations embodied in its terms of service and data use policy. Here, Facebook also maintained that ignoring its users’ constitutional right to privacy would severely damage its ability to maintain and broaden its user base.[24]
Because Facebook’s participation in delivering unbounded information concerning 381 of its users — as well as information concerning what amounts to thousands if not tens of thousands of those users’ friends and fellow enthusiasts — could have an adverse impact on Facebook’s own business operations, Face-book has articulated a sufficient injury to itself to establish standing, quite apart from section 2703 (d).
c. Third-Party Standing
In addition to asserting its own rights, Facebook is here entitled to assert the Fourth Amendment rights of its users under the traditional test for third-party standing.
Indeed, the District Attorney barely contests Facebook’s satisfaction of that test.
Instead, the District Attorney has confused the two very different questions of (1) whether and how far the exclusionary rule extends to third parties who were not the subject of an unlawful search and seizure; and (2) when does a litigant, who is in some degree of privity with a third party and better placed to stand in the shoes of that party for the purposes of vindicating that party’s rights, have standing to assert the rights of that third party? The first question is the focus of the District Attorney’s argument concerning Facebook’s standing, but is not relevant here. The exclusionary rule is a judge-made doctrine, designed to provide a sufficient deterrent to unlawful searches and seizures. The extent of its sweep is determined by policy judgments about how broadly (or narrowly) the rule must extend to provide a sufficient deterrent while not excessively barring the use of probative evidence. Those concerns are not at play here. In contrast, the traditional test for determining third-party standing asks whether, because an aggrieved party is poorly situated to protect his or her own rights, *279 there is another party better situated and properly motivated to do so. Facebook is correct to apply the traditional test.
Under that test, the federal courts recognize the right of litigants to bring actions on behalf of third parties, provided the litigant: (a) has suffered an injury in fact sufficient to inspire concrete interest in the outcome of the case; (b) has a close relation to those third parties; and (c) is free of some hindrance obstructing the third parties’ ability to protect their own interests (Powers v Ohio, 499 US 400, 410-411 [1991]).
We have not articulated a version of that test specific to New York State. The Appellate Division, writing without the benefit of Powers in People v Kern (149 AD2d 187, 233 [1989]), articulated and adopted what it then understood to be the federal standard. Rather than follow the Appellate Division’s outdated interpretation of federal practice, I apply the three-part Powers test.
No one questions that Facebook satisfies two of Powers’ three criteria.[25]
Thus, whether Facebook may assert the rights of its users turns on the degree to which its users would be able to protect their own Fourth Amendment rights. The District Attorney argues, and the majority agrees, that those users can vindicate their rights through pretrial suppression hearings or civil remedies. Neither I, nor — much more importantly — the delegates to the 1938 constitutional convention agree.
Few users will be afforded the opportunity to invoke an exclusionary remedy to the alleged Fourth Amendment violation. We now know that, of the 381 users whose accounts were seized, only 62 were ever charged. Most, perhaps all, of those 62 pleaded guilty and were sentenced to probation, community service, or conditional discharge. Not one of them moved to suppress evidence seized through the SCA warrants. As we have written, “ [t] o allow the failure to prosecute ... to serve as a shield for the allegedly illegal seizure and retention of private property by government agents would be to make a mockery of justice” (B. T. Prods., 44 NY2d at 233).
*280 The case at bar is even worse than contemplated in B. T. Prods. Although some of the 319 users whose accounts were seized but who were never charged no doubt owe their relief to prosecutorial discretion, a number of the users — such as the high school students — could not themselves have been suspected of engaging in disabilities fraud and could thus never have had an opportunity to challenge the seizures in a criminal court.
It is wholly unrealistic to suggest that those high school students and other persons targeted by the dragnet, not because they were suspected of disability fraud but because they knew someone who was, should vindicate their rights by filing civil suits against the government under section 2707 or 42 USC § 1983. The delegates to the 1938 constitutional convention, who debated the practicalities of civil suits at some length, were adamant that this suggestion “may appeal to a jurist cloistered in his study, but let the average citizen try it!” (1 Revised Record at 362.) The delegates recognized that “the excuse of the officer’s zeal in the performance of what he would describe as a public duty” (id.) and the expense of challenging a defendant with the “financial resources of the city back of him” (id. at 459) would make “these remedies in any concrete instance . . . ineffective” (id. at 529) and so impractical as to be “unreal” (id. at 519) or “absurd” (id. at 364).[26] The prospect of civil suits to vindicate unlawful searches and seizures was *281 offered as a reason against adding article I, § 12, to the New York Constitution. Roundly rejecting that position, the delegates, and later the People, adopted not just the language of the Fourth Amendment verbatim, but added to it the language specifically sanctifying electronic communications transmitted via a third party. Even stipulating that each user would, despite the initial indefinite gag order, be told at some point of the seizure, the mere formal possibility of a civil suit does not foreclose Facebook from asserting third-party standing as the litigant best placed to vindicate its users’ rights in practice, before a violation of any rights has occurred, by way of the adversarial system on which our rule of law rests.
IV. Conclusion
Under the majority’s decision, this Court is powerless to protect the business interests of a major company; return information seized from either the 381 individuals, many of whom were never suspected of wrongdoing, or the thousands of innocent individuals who communicated or simply happened to share an interest with a user named in the bulk warrants; prevent a patchwork of opposing jurisprudence on an emerging federal and constitutional issue from creeping across the state; and vindicate the rights granted to New Yorkers in article I, § 12. Although seizing social media content to help curtail widespread disabilities fraud may seem to some a good bargain, the delegates of 1938, with their eyes trained on the gathering storm across the Atlantic (or, in the case of many Republican representatives, on the New Dealer in the White House), remind us that
“the time may come not when some district attorney will have trouble in convicting somebody, not when the rights of some crook ought to be forgotten and he ought to be in jail, not when a crook may or may not be convicted, but the time may come in this State when times will become political, and you will be a convict in the eyes of the other fellow if you don’t believe in his political philosophy.
*282 “If there is any excuse for a written constitution, if there ever has been any excuse for a written constitution, it is to write in there the protection for the minority ¿gainst the aggression and the greed and the brute force of the majority.” (1 Revised Record at 465.)
The concern of this case, like the concern of the delegates’ generation, is not with crime waves, but with the protection of the individual against the power of the government.
“[T]he issue,” in the language of 1938,
“is both clear and simple. It is one of honesty, plain, common honesty. Shall we say what we mean, and shall we mean what we say? Shall we prohibit wiretapping in one breath and admit the evidence obtained in violation of the prohibition in the other breath? Do the gentlemen of the opposition subscribe to the principle that we should adopt a constitutional amendment here with all the sacrosanctness that that imports, and then say to the enforcement officials, ‘You may disregard it, you may violate it, you may override it, you may flout it, if you please, and we will not only uphold you, but the State will adopt the fruits of your crime?’ If that is their position, then God help us. I know of no better invitation to political tyranny or official lawlessness. This kind of logic . . . may be properly described in the words of one of our distinguished statesmen as either crack-pot or boloney. That is all it is. If this is their position, then we say to them now that they are creating a despotism clothed in the robes of legal sanction, nothing more, nothing less.” (1 Revised Record at 504-505.)
Constitutional and congressional words of promise were given to our ear, and I would not break them to our hope. I respectfully dissent, and would remand this case to the Appellate Division to resolve the motion to quash or modify the warrants, as well as the pendant matters involving the permissibility of an indefinite gag order and the disclosure of the underlying affidavit. As one of the delegates to the 1938 convention urged his fellow representatives, “let us decide this thing on the merits” (1 Revised Record at 462).
*283 Chief Judge DiFiore and Judges Abdus-Salaam and Fahey concur; Judge Rivera concurs in result in a separate concurring opinion; Judge Wilson dissents in an opinion; Judge Garcia taking no part.
Order affirmed, without costs.

. For a concise history of the Fourth Amendment and its importance, see Boyd v United States (116 US 616 [1886]).

. Since Mapp v Ohio (367 US 643 [1961]), the Fourth Amendment has applied with equal force to state officials.

. A letter addressed to the Convention from then-Governor Herbert Lehman suggested that “[w]e must be ever vigilant to apply to new situations, created by modem conditions, principles that we long ago emblazoned in the Bill of Rights of the Constitution of the United States” (1 Revised Record at 340). A delegate made the analogy explicit, arguing that
“[o]riginally we had no telephone or telegraph. All communication was personal or by post. No one has ever permitted or advocated the violation of the privacy of our mails. Eavesdropping on personal communications could be easily detected and prevented, and privacy thereby assured. Telephone and telegraph, radio and wireless, are more advances and refinements of personal and postal communication. Why are they not entitled to the same protection? How can anyone justify a different rule applicable to them?” (Id. at 530.)

. A delegate explained,
*258 “[I]n the country where the party wire is a sort of an institution, it has always been more or less of a diversion to listen in when the bell rings on the neighbors’ lines . . .
“Now, so far as the telegraph is concerned, we take a document down to the telegraph office and we publish it, and unless it is in code there is not much secrecy with reference to that” (1 Revised Record at 541).
A subsequent speaker agreed that “[t]he telephone has never been popularly considered a private means of communication, not even for social calls. Not alone are there still party lines, but the central office can cut in, and there is the ever-present possibility of crossed wires, as a result of which conversations are frequently overheard” (1 Revised Record at 558).

. Facebook groups can attract millions of members based on shared interests as anodyne as a sports team or as quintessentially sensitive as a political position.

. Although the majority and I disagree on the ultimate disposition of this case, it is important to clarify that we agree certain portions of the Appellate Division’s ruling should not be taken to bind the decisions of other courts in this state. Because the majority opinion affirms the lower court’s ruling only insofar as the First Department dismissed the appeal as taken from a non-appealable order, the propriety of a motion to quash a Stored Communications Act (SCA) warrant in the first instance remains an open question in New York (majority op at 252) — as does whether the Fourth Amendment, to say nothing of New York Constitution, article I, § 12, protects computer records against unreasonable searches and seizures. On the latter question, where the Appellate Division has already misled our trial courts (see People v Thompson, 51 Misc 3d 693, 710-714 [Sup Ct, NY County 2016] [criticizing but applying the First Department’s assertion that the Fourth Amendment is inapplicable to digital content]), the Appellate Division’s decision should be vacated or regarded as dicta, based on the majority’s holding that the motion to quash was not appealable at all.

. Hence, the majority’s observation, citing several of our decisions, that “a fundamental precept of the jurisdiction of our appellate courts that ‘ “[n]o appeal lies from a determination made in a criminal proceeding unless specifically provided for by statute” ’ ” (majority op at 242) has no application here, because the “determination” of Facebook’s motion to quash was not “made in a criminal proceeding” (and was authorized by a federal statute). It goes without saying that each of our precedents relied on by the majority concerns a state-law warrant, not a federal SCA warrant that grants a service provider a right to move to quash.

. The SCA’s original sponsor, Senator Patrick Leahy, continued to ascribe these three aims to the act even while this case was being argued below (Statement of Senator Patrick Leahy [D-Vt.], Chairman, Senate Judiciary *262 Committee, on the 27th Anniversary of the Enactment of the Electronic Communications Privacy Act, https://www.leahy.senate.gov/press/statement-of-senator-patrick-leahy-d-vt-chairman-senate-judiciary-committee_on-the-27th-anniversary-of-the-enactment — of-the-electronic-communications-privacy-act- [accessed Mar. 10, 2017], cached at http://www.nycourts.gov/ reporter/webdocs/Press Release _ Press Releases _ Press _ U.S. Senator Patrick Leahy ofVermo.pdf). The majority’s description of the SCA as balancing privacy expectations and law enforcement needs (majority op at 241) obliterates Congress’ third, and coequal, concern.

. A warrant is a type of order in the federal courts. Although New York law would not determine what Congress meant by “order” in this instance, “[a] search warrant is a court order” in New York (CPL 690.05 [2]).

. Even were the final sentence of section 2703 (d) construed to apply only to court orders for disclosure under subsection (b) or (c), the due pro *263 cess clause of the Fourteenth Amendment would entitle Facebook to a hearing prior to the entry of any order depriving the company of a significant property interest, in this case its employees’ time and the public’s goodwill. In United States v New York Telephone Co. (434 US 159 [1977]), the Supreme Court examined the government’s power to compel an earlier generation of analogous service providers — the telephone companies — to install pen registers and call tracing equipment. The Court held that the power to “impose duties upon third parties is not without limit; unreasonable burdens may not be imposed” {id. at 172). Although the Court found no unreasonable burden had been imposed in that case, subsequent Third and Ninth Circuit decisions have held that the risk of an erroneous deprivation of property rights requires a hearing on the issue of burdensomeness before a telephone company can be compelled to cooperate in electronic surveillance, notwithstanding any delay to an investigation that would be caused by a hearing {Application of United States of Am. for Order Authorizing Installation of Pen Register or Touch-Tone Decoder & Terminating Trap, 610 F2d 1148, 1156-1157 [3d Cir 1979]; Application of United States of Am. for Order Authorizing In-Progress Trace of Wire Communications Over Tel. Facilities, 616 F2d 1122, 1132-1133 [9th Cir 1980]). Internet providers are entitled to at least the same degree of due process protection, which squares with the SCA’s provision of a right to move to quash whether the order is a warrant or a subpoena.

. The United States District Court for the Eastern District of New York, wrestling in a recent case with the substantively identical “unreasonable burden” language arising out of the New York Telephone Co. line of cases, identified a variety of unreasonable burdens that led it to deny the government’s motion to compel Apple to unlock a suspect’s iPhone (In re Apple, Inc., 149 F Supp 3d 341, 368-373 [ED NY 2016]; but see In re XXX, Inc., 2014 WL 5510865, 2014 US Dist LEXIS 154743 [SD NY, Oct. 31, 2014, No. 14 Mag 2258]). The Eastern District’s argument that “the category of unreasonable burdens is not nearly so narrow” (149 F Supp 3d at 373) as unre-imbursed financial costs arising directly from the work and instead includes compelling a company to act in ways offensive to it or in ways that would tarnish its brand is given credence in this case by the section 2706 requirement that government entities seeking information from service providers reimburse reasonable and necessary costs “directly incurred in searching for, assembling, reproducing, or otherwise providing such information” (18 USC § 2706 [a]). Because that requirement would limit the instances in which administrative costs were so unduly burdensome as to be cause to quash or modify a court order, the drafters must have contemplated a more expansive definition of an “undue burden.” This is precisely the type of burden recognized by In re Apple’s interpretation of the Supreme Court’s holding in New York Telephone Co. (149 F Supp 3d at 368-373).

. In Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp. (829 F3d 197, 205 n 9 [2d Cir 2016]), the Second Circuit, by citation to its prior decision in United States v Construction Prods. Research, Inc. (73 F3d 464, 469 [2d Cir 1996]), suggested that a motion to quash an SCA warrant issued prior to the commencement of a criminal proceeding is, by analogy to an administrative subpoena, immediately appealable. The issue of the appealability of an SCA warrant was not presented in that case, because the parties stipulated to a stayed contempt order, which the district court entered, and Microsoft amended its notice of appeal in that regard.

. The incorporation of New York State law governing the issuance of warrants means that the District Attorney may have needed to seek eavesdropping warrants, which he did not do, before “intercepting or accessing . . . an electronic communication” (CPL 700.05 [1]; see also Penal Law § 250.00 [6]). Prior to obtaining an eavesdropping warrant, the District Attorney would have had to establish “that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ” (CPL 700.15 [4]). Lower court rulings that eavesdropping warrants are required only for messages in transit (see e.g. Gurevich v Gurevich, 24 Misc 3d 808, 811-813 [Sup Ct, Kings County 2009]) appear to have read the plain meaning of “accessing” out of the statute. However, Facebook did not raise that defect here, and I note it only in passing.

. At least two other state courts of last resort have found that state courts must follow federal rules when state appellate review is necessary to protect a substantial federal right (Johnson v Fankell, 520 US 911, 914 [1997], collecting McLin v Trimble, 795 P2d 1035 [Okla 1990] [finessing the matter by treating what was brought as an appeal as a reviewable original action, similar to Abrams’ “special (civil) proceeding” (Matter of Abrams [John Anonymous], 62 NY2d 183, 192 [1984])], and City of Lakewood v Brace, 919 P2d 231 [Colo 1996] [applying federal rules in state court]). Although Johnson declined to require a state court of last resort to adhere to federal rules concerning the appealability of orders denying qualified immunity, that decision rested on three factors absent here: (1) the defendants in that case could have their claims fully reviewed after the entry of final judgment, whereas Facebook can have no other day in court; (2) the consequence of applying the state’s rules on interlocutory appeals deprived the state — not the plaintiff — of an advantage, so that no competition between federal and state interests was at issue (the competing interests in that case involved the state’s judgment of how best to balance two state interests, viz. limiting interlocutory appeals and providing state officials with an immediate review of an adverse qualified immunity determination), whereas a federal statutory interest is manifestly present here; and (3) the Supreme Court was justifiably more reluctant to impose federal rules than state courts themselves need to be about importing those rules voluntarily (Johnson, 520 US at 919-920).

. Even apart from the statutory grant of standing, a simple way to understand why Facebook has standing is to remember that the government cannot search or seize Facebook’s business records or property without a warrant. Facebook has business interests that may be unduly burdened by compliance with the warrants. Because the injury to those business interests may turn in part on whether the bulk warrants are constitutional, there may be some overlap between arguments that Facebook could make and arguments its users could make. That overlap, however, does not negate Face-book’s own stake in the matter.

. The majority does suggest that Facebook could attempt to compel disclosure of the affidavit, pointing to Matter of Newsday, Inc. (3 NY3d 651 [2004]), a short memorandum in which we suggested an appellant denied the opportunity to appeal an interlocutory order in a criminal proceeding could either bring a Freedom of Information Law request or a civil proceeding pursuant to CPLR article 78. The majority does not contend an article 78 suit would also have presented Facebook with a viable mechanism for challenging the voluminousness or burden imposed by the warrants. In fact, News-day tried to do exactly that — and, ironically, the Appellate Division converted its article 78 suit into an appeal (id. at 652).

. Had Supreme Court found against the District Attorney, his office would have been entitled to benefit from a symmetrical appeal (see e.g. People v Still, 48 AD2d 366 [1975]). The appellate courts are open equally to the government and the service provider, and there is no reason to think that acknowledging motions to quash SCA warrants are appealable may not benefit the District Attorney in the next case.

. Abrams does not require a proceeding to be closely analogous to a motion to quash a subpoena to inaugurate a special civil proceeding incident to, but separate from, a criminal one. In fact, Abrams itself extended not only to a motion to quash a subpoena, but also to a motion to disqualify an attorney. The proper analysis, then, should focus on the true nature of the proceedings (here, essentially, a disclosure request served on an innocent third party), and not on whether the SCA bulk warrants operate more like traditional search warrants or subpoenas. Nevertheless, because the bulk warrants do operate more like subpoenas, I leave that issue for another day.

. The delegates to the 1938 Constitutional Convention themselves thought the term “warrants” poorly characterized the type of order that should be required to seize electronic communications. As one of the leading proponents of what became the relevant sentence of article I, § 12 noted, “The proposal of Senator Dunnigan uses the words, ‘ex parte orders.’ I believe such terminology is better, I think it fits more effectively the work of district attorneys; I think a warrant implies some kind of service on a person, and to use the words ‘ex parte orders’ makes it clear that it can be obtained from a court and it can be kept secret” (1 Revised Record at 472-473). Although section 12 as ultimately drafted requires “ex parte orders or warrants” as the seemingly inadvertent result of a broader, and rushed, compromise between the doughty Senator Dunnigan and his chief Republican adversary, even that final language supports the conclusion that the delegates, too, considered the 1938 precursor of the SCA warrant to be a hybrid.

. The majority asserts that “SCA warrants are governed by the same substantive and procedural laws as traditional search warrants,” but cites CPL articles 690 and 700, and People v Tambe (71 NY2d 492 [1988]) — all of which concern wiretapping warrants, not SCA warrants.

. The majority’s contention that “SCA warrants are governed by the same substantive and procedural laws as traditional search warrants” (majority op at 246) conflates the manner of their issuance with the manner of their execution and ignores the fact at the heart of this case: SCA warrants differ from their traditional counterparts in significant part because Congress declared their recipients could move to quash or modify the orders.

. (See e.g. Matter of Di Brizzi [Proskauer], 303 NY 206 [1951] [individual could appeal the denial of a motion to quash a subpoena ordering he testify before the Governor’s crime commission, a body without the power to charge or try defendants]; Matter of Hynes v Karassik, 47 NY2d 659 [1979] [respondent previously acquitted in a criminal trial could appeal an order unsealing the records of that case]; Matter of Codey [Capital Cities, Am. Broadcasting Corp.], 82 NY2d 521 [1993] [reporter subject to a State of New Jersey subpoena to reveal confidential sources, whose presence was demanded by New Jersey pursuant to CPL 640.10 (2), could appeal the CPL article 640 determination]; Matter of Santangello v People, 38 NY2d 536 [1976] [petitioner who had allegedly participated in the bribery of police officers could not appeal the denial of an order directing the prosecutor to admit the petitioner was the subject of electronic surveillance]; Matter of Alphonso C., 38 NY2d 923 [1976] [respondent who owned the car used in an attempted homicide could not appeal an order directing him to appear in a police line *276 up; separate appellant suspected of grand larceny could not appeal an order directing him to provide a handwriting sample]; Matter of Bernstein [Tom’s Assoc. — New York County Dist. Attorney], 67 NY2d 852 [1986] [petitioner could not appeal the disclosure of notices of tax deficiency to prosecutors].) Indeed, the only exceptions appear to be Abrams itself (allowing witnesses who might someday be charged with the illegal sale and distribution of tickets to large events) and Boikess (allowing university professors suspected of smoking pot with their students to move to quash). The aberration in Abrams can be explained by the Court’s suspicions that the investigation may result “in no criminal charges or civil complaints being filed at all” {Abrams at 193). In either case, both Abrams and Boikess depart from the Appellate Division’s taxonomy to allow an appeal Marin might have foreclosed.
Cases in which an appeal was dismissed from a proceeding arising in a court with limited and exclusively criminal jurisdiction (see e.g. Matter of Ryan [Hogan], 306 NY 11 [1953] [dismissing appeal from order of Court of General Sessions of County of New York]) or that resulted from an innocent third party’s effort to intervene in an ongoing investigation (see Newsday, 3 NY3d 651) are outside the scope of Marin and inapposite to the issue at hand. The Supreme Court possesses civil and criminal jurisdiction {Abrams, 62 NY2d at 191), and, contrary to the government’s assertion, Facebook is not seeking to involve itself in a criminal process. Instead, we are here because its involvement has been compelled by the District Attorney.

. As to the question of whether Facebook argued that the warrants were too voluminous and too burdensome, Facebook argued in Supreme Court that “this set of warrants exceeds by more than tenfold the largest number of warrants we ever received in a single investigation,” informed this Court that it “was forced to conduct a burdensome search of hundreds of its users’ accounts,” and has asserted an independent business and financial interest in ensuring that its users’ privacy rights are respected.

. The costs associated with this litigation illustrate how seriously Face-book takes this threat to its financial well-being.

. Facebook’s conscription by the District Attorney’s office and the threats to its business state injuries in fact. Its business relationship with its users, with whom it has an agreement as to the terms of service, and by whose defection its business would be threatened, is as substantial a relationship as those accepted by the courts in several landmark third-party standing cases (see e.g. Craig v Boren, 429 US 190 [1976]).

. They also had a good deal to say against the idea that the proponents of the Magna Carta and the Declaration of Independence could possibly have contemplated what we would now recognize as a liability rule for Fourth Amendment violations.
“Do you suppose, for example, that the barons at Runnymede, when they insisted on their rights from King John, were asking for the right to sue King John’s police officer? . . . [D]o you suppose that they had any idea at all, when they asked to have this written into the Magna Charta, that what they were actually asking for was the right to go to King John after he had violated it and say, ‘Now, King John, won’t you remove this officer?’ Why, of course they didn’t. You know they didn’t.
“There is not a man or woman in this room that believes that when the American colonists back in 1776 were putting up the fight for freedom and for liberty, when they drew up their Constitution and they put these things in, that they had any such idea in mind. Do you think the men who fought at Bunker Hill, do you think the men who walked in the snow with bloody feet at Valley Forge, do you think that the men that fought over here at Ticonderoga, were fighting for the right to resist the police officers of King George? Do you think they were fighting for the right to sue a police officer of King George, or do you think they *281 were fighting for the right to resist an unreasonable search and seizure on the part of Ring George’s henchmen? You know they were not. You know that when they wrote that into the Bill of Rights of the Federal Constitution they thought those were living words, not a mere empty skeleton without any meat or flesh or blood upon it.” (1 Revised Record at 460.)